JOHN VANCE v. C. UPSON, EXECUTOR, ET AL.

(Case No. 5811.)

1. TESTATOR—WILL—MENTAL CAPACITY—CHARGE—See facts for charge correctly informing the jury as to the mental capacity requisite to the making of a valid will, and properly defining an insane illusion and its bearing on testamentary capacity.

2. CHARGE—WEIGHT OF EVIDENCE—See opinion for charges upon the weight of evidence.

3. EVIDENCE—PAPERS OFFERED FOR PROBATE—In a contest over the probate of a will the jury should be instructed to consider the papers offered for probate in connection with the other evidence in the case, and not the papers alone, for the purpose of ascertaining whether the testator had testamentary capacity at the time they were executed.

Syllabus.

4. SAME—The jury might conclude that the provisions made in the papers offered for probate were proper and natural, and such as a rational man might or would make, and at the same time believe, and be justified in believing, from all the evidence, that they did not make such a disposition of the property as the testator would have made had he not been acting under an illusion which affected the disposition of his property.

5. SAME—CHARGE—See opinion for charge which did not withdraw from the consideration of the jury the instruments offered for probate as evidence of the testamentary capacity of the testator.

6. EVIDENCE—EXPERT TESTIMONY—HYPOTHETICAL CASE—See facts for evidence of physicians, testifying as experts, bearing upon the mental condition of a testator and based upon the facts proved in the case, held admissible. (Authorities cited.) Such hypothetical questions must be based upon facts proved.

7. EVIDENCE—IMPEACHMENT OF WITNESS—See facts for evidence held admissible to impeach a witness.

8. VERDICT—CERTAINTY—See facts for verdict not capable of misconstruction.

9. EVIDENCE—WHEN MISLEADING—A question propounded to a witness may be subject to objection, although the answer may not mislead the jury or injure the opposite party. See facts.

10. SAME—PRACTICE—This court will not decide whether or not a question was proper when the record fails to show that it was answered.

11. SAME—See opinion and facts for objections to evidence properly overruled.

12. SAME—TESTAMENTARY CAPACITY—LETTERS—FORMER AND SUBSEQUENT WILLS—A will offered for probate was written by the testator and was regular and testamentary in character. Several letters were offered in evidence by the contestants, written by the testator at various times both before and after the making of the papers offered for probate, and showing conclusively that at those times the mental vision of the testator was blinded by illusions. They also offered in evidence a number of wills, written by the testator on the same days the letters were written which bore no evidence of a deluded mind. *Held:*

(1) The letters and wills were admissible to assist the jury in determining what weight should be given to the fact that the testator was able to plan and write papers testamentary in character, which, on their faces, would not bear such evidence of insanity as to arouse suspicion of his want of testamentary capacity.

(2) The papers purporting to be wills were properly admitted for the further reason that the proponent was bound to show that the papers offered for probate were in fact and in law the last will of the testator.

13. SAME—PETITION FOR GUARDIANSHIP OF TESTATOR—A petition for guardianship of the estate and person of the testator filed by proponent, proponent's management of the estate and desire to have the fact concealed from the testator, were all relevant facts, and admissible.

14. SAME—See opinion for evidence held admissible in connection with other evidence in the case.

15. SAME—HYPOTHETICAL QUESTIONS—ANSWERS—A witness cannot be compelled to answer "yes" or "no" when the nature of the question is not such as to make such an answer appropriate; in such a case it is not only the right but the duty of the witness so to answer that he may state the very truth, and have the jury clearly to understand his answer.

16. DEPOSITION—PRESENCE OF WITNESS—The depositions of a witness cannot be

read in evidence over the objections of the opposite party when the witness is present in court. (Randall v. Collins, 52 Tex., 442.)

17. SAME—IMPEACHMENT—After the witness has testified in court, his answers there made may be contrasted with his answers made upon the same subjects in his depositions, with a view to impeach his testimony.

18. EVIDENCE—INTEREST OF WITNESS—It is always admissible to show what interest a witness has in the subject matter of litigation.

19. SAME—ADMISSIONS—Any evidence tending to show that the proponent of a will, who is a witness in the case, has acted upon a theory that a former will, made by the testator, and probated, was the only will made while the testator had testamentary capacity, is admissible.

APPEAL from Bexar. Tried below before the Hon. L. N. Walthall, Special Judge.

This was a proceeding to probate an olographic will and two olographic codicils, made by James Vance, of San Antonio, deceased, and bearing date, respectively, May 14, July 15 and July 24, 1870. The answer set up the defense of insanity. A former olographic will of James Vance, bearing date, Paris, France, April 27, 1867, having been admitted to probate in Bexar county on March 26, 1881, that proceeding was asked to be set aside, Vance having died in San Antonio on February 27, 1881.

On January 9, 1882, proceedings were instituted in the county court and the case, after hearing, was appealed to the district court, where at the March term, 1884, a trial was had, and the jury failed to agree.

At the December term, 1884, the cause was dismissed by the court for want of jurisdiction, brought to this court on error, and at the April term, 1885, reversed and remanded. At the December term, 1885, of Bexar district court, the cause was again tried, resulting in the following verdict: "We, the jury, find in favor of the contestants and against the will."

A large number of witnesses were introduced, and their testimony conflicted on various points, but the great weight of evidence was to the effect that from 1868 to the time of his death, James Vance was of unsound mind and was afflicted with various illusions. During the latter part of the year 1868 he had a stroke of appoplexy, or something of a kindred nature, and from that time his brain seemed affected. Among other things he imagined that different members of his family had poisoned, and were trying to poison him; that his son, who died of consumption in 1869, had been poisoned; that his relatives had robbed him, etc.

At times he would become violent, while at others he would be extremely mild, and converse on various topics in the most intelligent manner, displaying no evidences of insanity. Between the year 1870 and

the time of his death he made a large number of wills and codicils, some-times making a number on the same day.

The court charged the jury: "If James Vance was of sound mind he was competent to make a last will and testament, and thereby devise and bequeath all his estate, real, personal and mixed, to whomsoever he saw fit.

This, then, is the question for your consideration: Was he, at the time of the execution of the paper writings, of sound mind?

In the consideration and determination of this question, you are in-structed to consider all the testimony which has been admitted before you, including the papers which are propounded for probate, giving to each portion such credibility and weight as you may think it entitled to.

Ordinarily, less capacity is requisite to enable a testator to make a valid will than for the same person to make a contract or to engage in a struggle with another person, in which each is bargaining to secure the best terms, or to engage in intricate and complex business matters.

If at the time of making his will, he was capable of understanding the nature of the business he was engaged in, the nature and extent of his property, and the person or persons to whom he meant to convey it, and the mode of distributing among them, and was not under the influence of an insane delusion, which affected the diposition of his property, which he was attempting to make, this is sufficient, and he would have what is called testamentary capacity.　If, however, he had not the qualities or capabilities above enumerated, or if, at the time, he was laboring under an insane delusion, either in regard to his prop-erty, or the natural and proper objects of his bounty, which affected the disposition he was attempting to make, or of which delusion the papers were the offspring or fruit, then such a person was not in a condition to make a valid will, and a will propounded under those circumstances ought to be set aside, and held for naught.

Before admitting a paper or papers, purporting to be the will of James Vance, to probate, as his will, it is incumbent on those who propound it to prove to your satisfaction that he was of sound mind at the time he executed it or them. Further, if it has been proved by the testi-mony admitted, to your satisfaction that James Vance before he exe-cuted the papers propounded, and near the time of their execution, was insane, or was laboring under what has been variously called fixed, or settled, or habitual insanity, then it is incumbent on those who pro-pound the paper or papers to prove to your satisfaction that the paper or papers were executed during a lucid interval or during an interval when he was of sound mind.　What is meant by an insane delusion is

the belief of the existence of a state of supposed facts which no rational person would have believed.

A man may change his will as often as it pleases him to do so, and if it has been proved that James Vance did so change his will, then you will not conclude from that fact alone, that he was sane or insane, but will consider all the testimony which has been admitted, and from this testimony determine whether or not he was sane at the time he executed the paper or papers.

If, in consideration of all the testimony, including, as heretofore stated, the papers themselves, which are propounded for probate, you conclude that the proponents have proved to your satisfaction that James Vance was of sound mind at the time that he executed the papers propounded for probate, and that said papers as a will were not revoked by him, then your verdict will be in favor of the proponents and for the will. But, if you conclude from the consideration of the testimony, as aforesaid, that the proponents have failed to make such proof, then your verdict will be for the contestants, and against the will.

Again, if it has been proved to your satisfaction that at the time James Vance executed the papers propounded he was laboring under an insane delusion as to the natural and proper objects of his bounty, and that the papers propounded were the offspring or fruit of that delusion, then your verdict will be in favor of the contestants, and against the will.

Again, if it has been proved to your satisfaction that before and near to the time that James Vance executed the papers propounded for probate he was laboring under what has been variously called general, or fixed, or settled, or habitual insanity, then, unless it has been proved to your satisfaction by the testimony, as aforesaid, that at the time of the execution of the papers the disease of the mind was removed—that at that time he was of sound mind—then your verdict will be in favor of contestants, and against the will."

Contestant's hypothetical question: "Assuming, as facts, that a man then in fair health, was, in October, 1868, stricken by a fit of appoplexy, or something of a kindred nature, his one side being at the same time paralyzed, his brain being partially destroyed, and that this condition of the brain continued to exist from the time of the apoplectic and paralytic stroke until his death, in February, 1881."

"That his only son, and then only remaining child, died in April, 1869, after which he had various delusions, one being that friends and relations, some of them inmates of his own house, among them his family physician, had poisoned his son, when in reality his son had

died of consumption. Another delusion being that he had the stomach of his son taken out, in which poison was found, and that he had it in his possession and in his safe, when in fact such was not the case; also that he himself had been poisoned, accusing as his poisoners the same persons and others; that one person, in and for whom he had always expressed great confidence and friendship, attempted to way-lay and assasinate him while on his way to New York, where he was placed in a private insane asylum; that he was in the constant habit of picking up common stones, such as are found along streams, in the street and in his garden, discovering images upon them and naming them, giving them such names as General Washington, the Virgin Mary, etc., and seeing upon them scenes of obscenity, when others could not discover any images upon such stones; that he was in constant fear of murder and assassination; that these and other delusions continued until the time of his death; that he made a will and two codicils while these delusions continued, drawn by himself, in proper form, (being the instruments sought to be probated as his last will and testament), over a previous will already probated, and made in 1876; that at and about the same time of writing this will and two codicils, he wrote other wills in number to fill a peck measure, giving them to a relative with instructions to wrap them up in a woolen cloth, keep them safely, and at the proper time to select the one that suits the time; that at and about the same time he wrote still other wills, which were sent by teamsters and others from the place where they were written, (Castroville), to different persons at the place of his residence, (San Antonio); that after returning to his home in San Antonio he continued to write wills enough to fill an ordinary pigeon-hole in a desk, having also some thirty or more locked up in a safe, and handing others to different persons; that the wills above mentioned, so far as read or known, were also properly drawn and more or less antagonistic to each other. That in the will first mentioned he partially disregarded his only lineal descendant and gave one-half of his property to two, and in the last codicil to one, of his collateral relatives, not mentioning other collateral relations for whom he had always, prior to the existence of the delusion above recited, expressed great regard and affection, disregarding also a female inmate of his household who had for forty-five years been such inmate, had nursed his wife for ten years in sickness and until her death, had nursed him in sickness, had nursed his then deceased children in sickness and in health, and had charge of his house, all this without other compensation than her living in his family and being treated and regarded as one of them, and for whom

he had, prior to his delusions, always expressed great gratitude and his determination to provide for her during her life; one of the wills above mentioned giving his entire property, real and personal, to a person who was not a relative of his by blood, nor a connection by marriage, reserving, however, the sum of $50,000 to prosecute a man who had married his niece and with whom he was, prior to the death of his son, on most friendly and intimate terms, for poisoning his son. Assuming, we say, the above facts to be true, was, in your opinion, such person sane or insane?''

The following questions were put to proponent's witness, Mrs. F. E. Vance, on cross-examination, for the purpose of impeachment:

''About two years before the death of James Vance did you not go to his house, and did you not tell Miss Westfall that you did not wish to see him, because you were afraid of him? Did not Miss Westfall take you into a room, and did you not say that you would get near the window that extended to the floor so that you could get out if you heard him coming? Did you not then take your seat by the open window and begin talking to Miss Westfall about Mr. Vance, asking how he was and how he rested the night before? Did you not then hear him talking in another room, and walking as though he was coming out of the room he was in? And did he not come out of the room he was in, into the hall? And did you not run out of the room, down the steps, and into the yard towards your carriage? And did not James Vance call to you to stop? And did he not begin to curse you and use very profane language? Did you not stop a minute? And did not Miss Westfall motion you to go away? And did you not get into your carriage and go away?''

Answer—''I have not the slightest recollection of it. If anything of that kind had occurred I should have recollected it.''

Question—''Was not Mrs. Groesbeck present at the time or at a similar occurrence, when James Vance cursed you and used profane language?''

Answer—''I have no recollection of meeting Mrs. Groesbeck there at any time, and I am very sure that he never cursed me at any time.''

Over the objection of proponent contestants were allowed to read in evidence the answer of Catherine Westfall to her sixteenth direct interrogatory contained in her deposition, for the purpose of contradicting and impeaching the witness, Mrs. F. E. Vance, which was as follows:

'' I knew Mrs. Francis E. Vance, widow of William Vance. I have known her for twenty-eight years. She was aware of the fact that the said James Vance was crazy. Once, about two years, as well as I can

remember, before he died she came to his house to see me, and she
said that she did not want to see him, the said James Vance, because
she was afraid of him.  I took her into a room and she said that she
wanted to get near the window, which extended to the floor, so that
she could get out if she heard him coming.  She took her seat by
the open window, and began talking to me about James Vance, asking
me how he was, and how he rested the night before, etc.  Directly she
heard him talking in another room, and walking as though he was
coming out of the room he was in.  He did come out of the room he
was in, into the hall, and Mrs. Vance ran out of the room and down
the steps into the yard towards her carriage, and James Vance called
to her to stop, and began to curse her and use very profane language.
Mrs. Vance stopped a moment, and I motioned her to go away, and
she got in her carriage and went away.  The above occurrence hap-
pened about two years before said James Vance died, and at his house
here in San Antonio.''

The following question was propounded to Dr. Graves by contestant.

"Was James Vance, at any time during this condition of mind, as
you have given it in your opinion, capable of making an intelligent
will, or competent to make an intelligent reasonable disposition of his
property, or to transact any business?"

The answer was:

"If you mean making an equitable will by 'reasonable will,' I don't
think he could do it for the reason that he had mania with delusions.
He could not make an equitable will because he left out Catherine
Westfall, and that wasn't equity nor justice.  He thought she was
mixed up with the murder of his son.  As long as the delusion lasted
he couldn't make an equitable will."

Fourteenth Assignment of Error :  "The court erred in overruling
the proponent's objection to the following questions, put by contest-
ants to the witness John Vance, while on cross-examination, in refer-
ence to Catherine Westfall nursing the family of  James Vance :"

"Did she nurse Mrs. Vance in sickness? "  "Did she nurse Mrs. Hall
in sickness?"  "Did she nurse Willie in sickness?"

There was evidence showing that the testator had often expressed
his gratitude to Catherine Westfall, and his intention of providing for
her.

Proponent's Hypothetical Question, No. 7, addressed to Dr. Herff :
"Supposing that a person at the time of making his will has sufficient
active memory to collect in his mind, without prompting, the particu-
lars or elements of the business to be transacted, and to hold them in
his mind a sufficient length of time to perceive, at least, their more

obvious relations to each other, and be able to form some rational judgment in regard to them. Assuming that state of facts to be true, doctor, would they indicate sanity or insanity?"

Answer: "May indicate sanity or insanity."

Question repeated: "And assuming that state of facts to be true, doctor, do they not indicate sanity? I wish an answer, yes or no."

Witness answered "no," and attempted to explain; proponent objected and requested the court to stop the witness. The court overruled the objection, and the witness proceeded as follows:

"A man may be sane in many things, and still be a monomaniac. Suppose Mr. Vance would make a good will in all its business parts, and was laboring under the delusion that his family wanted to poison or kill him, I would consider this to be an insane man."

Proponent's Hypothetical Question No. 8, addressed to Dr. Herff:

"Supposing that at the time of making his will a person has sufficient judgment to know the number of those who are the proper objects of his bounty, their deserts with reference to their conduct, their capacity and their needs, and what he has before done for them, and the amount and condition of his property. Assuming that state of facts to be true, doctor, do they not indicate sanity—yes or no?"

Answer: "Can't answer yes or no to it. If it relates to James Vance, I say no."

Eighteenth Assignment: The court erred in overruling proponent's objection to the following questions put by the contestants to the witness, John Vance, on cross-examination:

"You expected to have charge of your brother James' estate, did you not?" (after the probate of the Paris will.)

Ninteenth Assignment: The court erred in overruling proponent's objection, and in permitting contestants to show by the witness, Mrs. F. E. Vance, the following, on cross-examination, to-wit:

"That she had an interest in the event of the suit. That she had an arrangement about a division of whatever might be obtained. What that arrangement was. That she conferred with John Vance about probating another will. That witness refused to pay part of the expense."

Twentieth Assignment: The court erred in overruling proponent's objection, and in permitting contestant's counsel to cite and read, as authority in his argument of the law of the case, and in the presence and hearing of the jury, an article written by —— Greenwood, in the Central Law Journal, vol. 18, No. 15, page 286, as incompetent, irrelevant and immaterial.

Twenty-first Assignment: The court erred in overruling propo-

nent's objection, and in permitting the following question to be put to the contestant, Columbus Upson, while on the stand:

"Did you have a conversation with John Vance with reference to the Paris will, and your qualifying as executor under that will, and if so, what was it?"

*T. G. Pray*, for appellant, on the instrument itself as proof of sanity, cited: 1 Red. on Will, 116, sec. 11, note 30 and cases cited; Denson *v.* Beazley, 34 Tex., 191; Rice *v.* Rice, 53 Mich., 432, 437; 2 Whart. & Stille's Med. Juris. and rev. ed., secs. 32, 33, and cases cited; Kingsbury *v.* Whittaker, 1 Am. Prob. Rep., 245; Will of Ebenezar Cole, 1 Am. Prob. Rep., 339; Will of Blakesley, 1 Am. Prob. Rep., 284; Lee's heirs *v.* Lee's executors, 4 McCord, 113; s. c., 17 Am. Dec., 722, and note; Jackson *v.* King, 4 Cow., 207; s. c., 15 Am. Dec., 354, and note; Chandler et. al. *v.* Barrett, executor, 21 La., 60; Hebert Tutor *v.* Winn, 24 La., 387; Franks *v.* his wife, 29 La., 302; Fraser *v.* Jennison, 42 Mich., 216, 221; Meeker *v.* Meeker, 75 Ill., 260, 266, and cases cited; Wms. Ex., 72, 78; Cartwright *v.* Cartwright, 1 Phill., 90; McAdam *v.* Walker, 1 Dow; Scruly *v.* Fordham, Abb. Tr. Ev., 115, 1st ed.

On hypothetical questions, he cited: Abb. Tr. Ev., 116, 117; People *v.* Lake, 12 N. Y., 358; Commonwealth *v.* Rogers, 7 Met., (Mass.) 500; Fraser *v.* Jennison, 42 Mich., 233; Will of Blakesley, 1 Am. Prob. Rep., 294.

On expert evidence, he cited: Abb. Tr. Ev., 117, and cases cited; Woodbury *v.* Obear, 7 Gray, 467, 471; Sanches *v.* People, 22 N. Y., 147, 154; Bonard's Will, 16 Abb. Pr., (N. S.,) 128; Fraser *v.* Jennison, 42 Mich., 233.

*Jacob Waelder*, for appellees, on the instrument as evidence of insanity, cited: 9 Jacob's Fisher's Dig., 13644, (presumption and proof of competency); 1 Beck's Med. Jur., 777, and note; 1 Red. on Wills, 3d ed., 48 and note; *Id.* p. 67 and note; 2 Greenl. on Ev., sec. 371; Browne's Med. Jur. of Insanity, sec. 393; Dran's Med. Jur., 528, 529.

That the verdict was in accordance with the law and evidence, he cited: 2 Pothier on Ob., Am. ed. of 1826, App. 579; quotations from Dr. Ray and others in dissenting opinoin in Denson v. Beazley, 34 Tex., 217; Browne's Med. Jur. of Insanity, secs. 23, 24, 148, 149, 153, 392, 393, 395; 1 Jarm. on Wills, (4th Am. ed.), 60, 61; Irish *v.* Smith, 8 S. & R., 573, 11 Am. Dec., 650; Harder *v.* Hays, 9 Penn. St., 151; Pidcock *v.* Potter, 8 Am. Rep., 182, and note, 188, 189; Beazley *v.* Denson, 40 Tex., 424; 1 Red. on Wills, 48, 49, note; Ingram on Wills, 15 Ch. 2; 1 Jarman on Wills, 75, note 2.

STAYTON, ASSOCIATE JUSTICE.—The charge given by the court, without request, was a clear presentation of the law applicable to the case, made by the evidence.   It, in clear language, informed the jury as to the mental capacity requisite to the making of a valid will; defined an insane delusion, and its true bearing on testamentary capacity, fully explained; and could not have been misunderstood by a jury of ordinary intelligence.

The fifth, sixth, seventh and eighth charges asked by the appellant, were given, although some of them were, in substance, in apt language contained in the charge already given.

The first, second, third and fourth charges requested by the appellant, were properly refused.   These charges ought not to have been given for two reasons:

1. They were charges upon the weight of evidence, and would have given the jury to understand that the papers offered for probate, of themselves, were the best and sufficient evidence of the sanity of the testator, and that the jury might hold them so to be, notwithstanding the jury might be of the opinion, from the other evidence before them, that these papers were the offspring of a mind acting under an insane illusion which prompted their execution.

This may be well illustrated by parts of the charges referred to, which are as follows:

"Peculiar opinions or delusions of one, who himself plans and executes his last will, will not invalidate such will unless those peculiar opinions or delusions appear on the face of the instrument itself."

"Therefore, if you find from the evidence, that the testator, James Vance, did have peculiar opinions, hallucinations or delusions, that fact will not avail, unless you further find that those peculiar opinions or delusions appear on the face of the papers presented here to be probated."

"The strongest and best proof that can arise as to a lucid interval or soundness of mind in the testator, is that which arises from the act itself of making the will."

"Therefore, if you find from the evidence that these wills were wholly planned and executed by James Vance, and that their provisions are proper and natural, and such as a rational man would make—in other words that it was a rational act, rationally done—I instruct you that, as a matter of law, the whole case for the plaintiff is proved."

These views run through all the charges which were refused, and to have given them would have violated the statute, which forbids a judge to charge upon the weight of evidence.

2. These requests were misleading, and calculated to withdraw the minds of the jury from the real issue in the case. The papers may be such as some rational man, situated as was the testator, might execute, with nothing apparent upon their faces to indicate a want of testamentary capacity, and still be the product of an unsound mind. The evidence in this case cannot be read without coming to the conclusion that James Vance was essentially an insane man from some time in the year 1868, until his death in the year 1881, and it seems not to be denied by the appellant, that during a great part of that time he had not testamentary capacity.

This is illustrated by the fact that other papers executed as wills by the testator subsequently to the papers offered for probate, although in due form, and written by the testator himself, are, in effect, admitted to have been executed at a time when the testator had not testamentary capacity. This is further illustrated by the fact that a will regular in form, executed between the time the will sought to have probated was executed, and the time of the execution of the codicils which are claimed to refer to it, and to be a part of it, is passed over, doubtless for the reason that the intervening will was thought to have been executed when the testator had not testamentary capacity.

It is contended, however, that the will and codicils, which the appellant seeks to have probated, were executed at times when this unsound condition of mind had ceased to exist, at least, for the time. The true inquiry was as to this fact, as to the testator's mental condition at the time the papers offered for probate were executed.

After carefully instructing the jury as to the degree of mental capacity requisite to the making of a valid will, the court instructed the jury as follows:

"If, however, he had not the qualities or capabilities above enumerated, or if, at the time, he was laboring under an insane delusion, either in regard to his property, or the natural and proper objects of his bounty, which affected the disposition he was attempting to make, or of which delusion the papers were the offspring or fruit—then such a person was not in a condition to make a valid will, and a will propounded under those circumstances ought to be set aside, and held for naught."

These charges presented the real issues made by the evidence as well as the pleadings in the case from which the requests would largely have withdrawn the mind of the jury, and fixed it upon the contents, form and manner of execution of the papers offered for probate as the controlling facts from which the testamentary capacity of the testator was to be determined. If the papers offered for probate were wholly

planned and executed by James Vance, and made such disposition of his property as a sane man similarly situated would be expected to make, then they would furnish strong evidence of his testamentary capacity, and a jury would doubtless give due weight to them. The court below more than once instructed the jury to consider the papers offered for probate, in connection with the other evidence in the case, for the purpose of ascertaining whether the testator had testamentary capacity at the time they were executed.

This was as far as the court could legally go in giving instructions. The jury from an inspection of the papers offered for probate, and from other evidence in the case, might have come to the conclusion that the provisions made in them were proper and natural, and such as a rational man might or would make, but at the same time have believed, and been justified in believing from all the evidence in the case, that they did not make such a disposition of the property as James Vance would have made had he not been acting under an illusion which affected the disposition of his property. Wills are not to be probated solely upon the ground that the disposition which a testator may make of his property seems to a court or jury a natural and proper disposition, nor are they to be refused probate because to the court or jury the disposition of the property may seem to be improper or unnatural.

If any other rule were adopted, the validity of wills would depend on the varying opinions of courts and juries as to what was a natural, reasonable and proper disposition of property, and not upon that absolute power of a testator, of sound and disposing mind, to dispose of his estate as to him may seem proper.

It is urged that a charge given at the request of the contestants withdrew from the consideration of the jury the instruments offered for probate as evidence of the testamentary capacity of James Vance.

That instruction was as follows; "The burden of proof that James Vance was of sound mind at the time of making the wills and codicils propounded in this case, is upon the plaintiff, and unless the evidence shows that he was of sound mind at that time, then the instruments presented for probate, however drawn, cannot be regarded as the will of the said Vance, and the verdict of the jury should be for the defendants or contestants." This instruction could not have been understood to have such effect.

It simply informed the jury that it must appear that James Vance was of sound mind, at the time the papers offered for probate were executed, to entitle them to probate, and that if this was not shown by the evidence, of which the papers themselves were a part, then

they were not entitled to probate, however drawn. The issue was : testamentary capacity or no, and throughout the entire charges this issue was held steadily before the jury, as it should have been. The degree of mental capacity which in law is termed "sound mind," when considered in relation to the making of a will, was fully and clearly explained in the charge given.

It was not urged, in the court below, that the hypothetical case upon which the opinions of the physicians, testifying as experts, were taken was not the case made by the evidence. The objection was that the evidence of physicians, bearing upon the mental condition of the testator, based on the facts proved in the case, was "incompetent, irrelevant and immaterial." Such evidence as was given by Drs. King, Barnitz, Cupples and Lowery, is believed to be very generally received in cases involving such questions as were presented in this case, even though their opinions be based on facts proved in a case, and not upon facts known to the witness. 1 Greenl. on Ev., 440; Whart. Law of Ev., 451, 452; Wharton & Stile's Med. Jur., 288-291; Abb. Tr. Ev., 116.

The question of testamentary capacity must, however, as it was in this case, be left to the determination of the jury. The hypothetical question put to Dr. Barnitz, by the appellant, was improper and correctly excluded by the court. It was not based on facts proved, but consisted largely of deductions drawn from the character of the papers of which probate was sought, about which there might be a broad diversity of opinion, and besides, assumed the very fact in controversy, i. e., that the papers taken together were such "only as a rational man would make."

The question in effect was this : "If no person other than one having testamentary capacity (a rational man) would execute such papers as his last will, then, do these papers show that the testator had testamentary capacity at the time they were executed?"

Mrs. F. E. Vance was interrogated in regard to the matters to which Miss Westfall was permitted to testify, with a view to the impeachment of the former witness. The interrogatory to the one witness referred to the same matters as did the interrogatory to the other. It was specific and certain as to time, place and circumstances, when and where the matters interrogated about occurred. No other part of the testimony of Miss Westfall than that which related to matters of which Mrs. Vance had been directly interrogated, were offered for the purpose of impeaching the testimony of the latter.

The testimony of these two witnesses, as to the general condition of James Vance from the year 1868, until the date of his death, was essentially different, and in so far tended, as does all conflicting evidence,

to contradict the one the other; but this was no reason for excluding the evidence of either. The two questions and answers referred to in the assignment, were asked for the purpose of laying the basis for impeachment in the usual way, and the appellant was in no way denied the right or opportunity to examine the impeaching witness fully. The appellant offered for probate the three papers purporting to be a will and codicils, as the last will of James Vance, and the finding of the jury necessarily embraces them all.

The question propounded to Dr. Graves was subject to objection, but in his answers he gave the facts on which he based his conclusion, and we see no reason to believe that the jury could have been mislead thereby. It does not appear that the question put to Dr. Herff, and referred to in the eleventh assignment, was answered by the witness, and it therefore becomes unnecessary to consider whether the question was proper. The appellant had testified as to the condition of James Vance, in the year 1870, while at Castroville, and there was no objection to the evidence of the witness Ulrich, tending to show that the witness had made different statements at other times, other than that such evidence was "incompetent, irrelevant and immaterial." These objections were properly overruled.

During the trial, many letters written by James Vance dating from a time intervening between the date of the paper offered as a will, and the date of the codicil, to the latter part of the year 1879, were read by the respective parties. Two papers, other than those offered for probate, dated April 22, 1870, and written by James Vance, purporting to be wills, and regular in form, were introduced. Another paper of the same kind and executed in the same manner, bearing date June 16, 1870, was also offered in evidence. A will executed by James Vance, on July 19, 1880, and also another executed by him on July 20, 1880, were offered in evidence.

All those wills were wholly written by James Vance, with nothing in their forms, manner of execution or distribution of his estate, to indicate insanity more than do the papers offered for probate. The letters last written and papers last executed, as wills, were objected to, but they were admitted for purposes other than to show the mental condition of the testator at the time the instruments offered for probate were executed. We are of the opinion that there was no error in admitting those papers.

The great weight of the evidence tends to show, if it does not conclusively show, that there was no improvement in the general mental condition of James Vance from the year 1868 until his death. The letters which were offered in evidence of April, 1870, bear conclusive

evidence that the illusions which blinded the mental vision of James Vance were then with him, but on the same day, the wills written by him bore no evidence of the existence of such illusions, which were of a character calculated to influence him in the selection of persons to be beneficiaries under a will and in the disposition of his estate. The same is true of the letters and wills written by him in the latter part of his life. These were matters of which the jury in connection with the other evidence should have been placed in possession; for they enabled them the better to determine what weight ought to be given to the fact that James Vance was able to plan and write papers testamentary in character, which on their faces would not bear such evidence of insanity as to arouse suspicion of his want of testamentary capacity. All the papers purporting to be wills were properly received in evidence for the further reason, that, the appellant was bound to show that the papers which he offered for probate, were in fact and in law the last will of James Vance.

Evidence bearing upon the capacity of James Vance to make a will, from the year 1868 until his death, was before the jury, and the many papers executed by him purporting to be wills, even under the views urged by appellant's counsel, were of the utmost importance to enable the jury to ascertain his mental condition at the time each of them was executed. Under the evidence the jury might or may have found that some of these papers executed after those offered for probate were executed, were in fact and in law the last will of James Vance.

We do not see but that the jury would have been as fully justified under the evidence, in finding that James Vance had testamentary capacity when he executed some of the papers of date subsequent to those offered for probate, as would they have been to find such capacity at the time those offered for probate were executed. Had the jury found that such capacity existed when one or more of the papers of later date were executed, it would have defeated the right to have probate of those offered, for some of those of later date were of such nature that they would operate a revocation of those now offered.

The many papers purporting to be wills wholly written by James Vance, but destroyed by other persons before and after his death, whose contents cannot now be known, may have been as free from evidence upon their faces of the insanity of the testator as are the papers offered for probate. The petition for guardianship of the estate and person of James Vance, filed by the appellant, his management of the estate, and desire to have this fact concealed from James Vance, were all relevant facts and properly admitted. If it was thought that a charge was necessary to inform the jury that some of the evidence

should not be considered in ascertaining what the mental condition of James Vance was when the papers offered for probate were executed, a charge should have been asked upon that subject, but as we have before said, we are of the opinion that the evidence referred to in the twelfth assignment of error was admissible upon all questions in the case. The bill of exceptions does not state what was expected to be the answer to the two questions referred to in the thirteenth assignment of error, hence the ruling of the court thereon cannot be here revised.

By the will of James Vance, which had been admitted to probate, Catherine Westfall was provided for; and we are of the opinion that the evidence referred to in the fourteenth assignment was properly admitted, in connection with the other evidence, for the purpose of showing the improbability that James Vance, while not under the influence of an illusion, would ever have excluded her from benefits under his will.

While a medical witness was on the stand, who had long been the family physician of James Vance, hypothetical questions were put to him by appellant's counsel, to which categorical answers were requested. These the physician gave so far as the questions would permit, but he insisted on explaining his evidence, in view of the questions, and the court permitted him to do so.

A witness cannot be required to answer "yes" or "no" when the nature of the question is not such as to make such an answer appropriate, and in such case it is not only the right but the duty of the witness so to answer, that he may state the very truth, and have the jury clearly to understand his answer.

Prior to the trial, the deposition of John Vance had been taken, and the witness being in court, the appellant proposed to read the deposition, which was objected to, and the objection sustained, on the ground that the witness should be placed on the stand. This ruling was in accordance with the decision made in Randall v. Collins, 52 Tex., 442.

If, however, this was not the proper practice, the ruling would be immaterial, as the witness testified fully in the case, and no injury is shown to have resulted from the ruling of the court. While this witness was on the stand he was interrogated as to some matters about which he had testified in the deposition, and so, with a view to impeach his testimony by contrasting his answers, then made, with those the witness had made upon the same subjects in the deposition.

After this, the appellees were permitted to read so much of the deposition as related to the matters on which the witness had been inter-

rogated, and it is urged that this was error. There was no error in this ruling. After this evidence was offered, the appellant proposed to read other parts of the deposition, as it is claimed, for the purpose of sustaining the witness by showing all that he said upon the subject upon which he was interrogated while on the stand as a witness. This was objected to and the objection sustained, but the bill of exceptions does not show what the excluded evidence was, nor that it had any connection with the parts of the deposition read, or with the matters upon which the witness had been interrogated. This being the case, the ruling of the court below cannot be here considered.

It was proper to show what interest any witness had, or expected to have, in the estate of James Vance under the will already probated, or would take by agreement or otherwise, under the papers offered for probate, should they be admitted to probate. It is always proper to show what interest a witness has in the subject matter of litigation, for a jury may consider that fact in determining the weight to be given to his testimony. Therefore, the evidence referred to in the eighteenth and nineteenth assignments of error was properly admitted. In the discussion of the law of a case to the court, much must be left to the discretion of the trial judge as to what shall be read in his presence by counsel, and it is not shown that anything was read in this case which it was not proper to read.

Any evidence which tended to show that the appellant, who was a witness in the case, had acted upon the theory that the will made by James Vance in 1867, which had been probated, was the only will made while the testator had testamentary capacity, was admissible; and especially so when it was shown that the witness had felt authorized to destroy many papers testamentary in character executed about the time or after those offered for probate were executed, and then had in his possession those now offered. Such evidence tended to show that in the opinion of the witness the papers now offered were executed at a time when the testator had not testamentary capacity, and this was a fact which the jury might take into consideration in determining the weight to be given to the testimony of the witness. Of this character was the evidence refered to in the twenty-first assignment of error.

It is urged that the verdict was not authorized by the evidence. The case was presented to the jury under a proper charge, the finding was in effect that the papers were not executed at a time when the testator had testamentary capacity, and an inspection of all the evidence in the case gives no reason to believe that the verdict is not fully sus-

tained by the evidence.    There is no error in the judgment and it must be affirmed.

It is so ordered.

AFFIRMED.

[Opinion delivered June 25, 1886.]