**RUDERSDORF et al. v. BOWERS et al.**
**No. 10460.**

Court of Civil Appeals of Texas. Galveston.
Dec. 22, 1937.

Rehearing Denied Jan. 20, 1938.

B. T. McWhorter, Jr., of Port Arthur, for plaintiffs in error Lula Aycock and husband.

E. R. Campbell, of Houston, for plaintiffs in error Estelle Rudersdorf and husband.

Masterson & Bryan, of Angleton, for plaintiffs in error Erna Seaburn and others.

A. R. Rucks and Follett & Henderson, all of Angleton, Royston & Rayzor, and Levy & Levy, all of Galveston, and Crain & Vandenberge, of Victoria, for defendants in error.

CODY, Justice.

This is a will contest. At this time the sole ground urged for setting aside the probate of the will is that the testator was without testamentary capacity. Only two assignments of error are urged: First, that the court erroneously instructed a verdict in favor of proponents; second, that the court erroneously sustained proponents' objection to the hypothetical question of contestants to their witness Dr. Stafford. Contestants are here plaintiffs in error, and proponents are defendants in error.

The testator, Earnest Seaburn, was a bachelor, 78 years old at the time of his death, August 26, 1934. He lived at Quintana on the Gulf, four miles from Freeport. Prior to his mother's death in 1909, he had lived with her. The Coveny family, to members of which he left $15,-500, lived just across the street. After his mother's death he took his meals there. He lived at their home after an illness in 1928. He still lived with them at the time of Mrs. Coveny's death during Christmas, 1931. After her death Mr. Coveny moved to Galveston where his daughters lived. Testator continued to reside in the Coveny home in Quintana, and frequently visited the family in Galveston, spending several days at a time. They would visit him at Quintana. He used to write them to visit him. To a grandniece of whom he was very fond, who was the daughter of A. S.

Bowers, testator left $5,000. This grandniece would drive down from Houston on Sundays and see him. To A. S. Bowers, his nephew, testator left two-thirds of his residuary estate. To Mrs. Mary Bowers Chilton, a niece, testator left a third of his residuary estate. The beneficiaries of the will referred to are defendants in error. Miss Erna Seaburn and Mrs. Hudgins were also his nieces, and resided at Vekasco, which is four miles from Quintana. To them he left $3,500, and $2,000, respectively. Mrs. Rudersdorf and Mrs. Aycock were also nieces, and his only heirs at law not made beneficiaries under his will. There is no evidence that they ever at any time visited him. At his death testator had $300 in the bank, securities of the face value of $23,850, and an undivided one-third interest in 6,764 acres of grazing lands in Brazoria county, which seem to have been under oil leases. The will was executed August 11, 1931, conformable to statutory requirements.

It is charged by defendants in error, not denied by plaintiffs in error, and apparent from the record, that, of the dozen or more witnesses called by plaintiffs in error to show lack of mental capacity, only three, other than those whose conclusions were by the court ordered stricken from the record and of which action no complaint is made, stated that testator was of unsound mind. These were J. L. Kramer, W. D. Vinson, and G. C. Hardeman. Kramer testified that he was employed by testator as a personal attendant for a week in 1931, from January to June of 1932, from September, 1932, to July, 1933; that he chauffeured, cooked, and kept house for testator. That testator drank at times and he had seen him cry a couple of times. That testator disliked two men for their activities connected with a dredging project which threw deposits close to his home. That he was sometimes afraid at night. Also that he was afraid some one would steal water out of the cistern at his beach house, and had the faucet locked. That testator went to the barbershop and "cussed different ones out." That testator bought the groceries for the two of them until he got sick in 1932; that he selected his purchases and knew the prices; that he never saw him in a mental condition that he couldn't go where he wanted to. That he went to the bank and transacted business like anyone else. That he had sufficient mentality to, and did, make the contract for the witness's personal services. That

he was not crazy. That he drove bargains for his money; he did his own trading at the drugstore and market, and was a discriminating purchaser. That he would read his newspaper and "rave" about what was in it. (It seems testator didn't like the Republican Administration, particularly President Hoover.) That testator frequently had witness to cash checks for him, and always knew the correct amount of change that was due him.

W. D. Vinson, who also testified that testator was of unsound mind, was an insurance man, and had known testator for twenty years. In 1929 or 1930, he tried to sell testator an annuity, and testator declined it, and said he had money in building and loan and "couldn't get a damn cent out of it," and that he had lost confidence in the government and financial institutions. He said he knew that testator was sane enough that, had he entered the contract, it would stand.

G. C. Hardeman, justice of the peace, had known testator since 1925. He took his acknowledgment to instruments at various times. He testified that he was not the same after his return from the hospital in 1929, and witness would say he was of unsound mind. That he was a man of fixed ideas and opinions and enjoyed arguments. That he knew how to transact business at the store. That he last took testator's acknowledgment some months before the trial to a mineral lease. That he was convinced by testator's acts and words that he knew the purpose of the various instruments he acknowledged, and that witness knew companies and third persons were paying out money on the strength of such instruments, and that they would not be legal if testator were of unsound mind. That he testified testator was of unsound mind because of his arguments; that testator was not insane; and that so far as he knew the leases and contracts acknowledged before him were valid.

When Miss Erna Seaburn, one of the contestants, qualified as administratrix de bonis non on June 13, 1929, in the estate of W. O. Seaburn, she obtained testator as a surety on her bond for the principal amount of $30,000. On January 8, 1929, when sureties were required for a receiver's bond in a suit pending in the district court of Brazoria county, styled Erna Seaburn et al. v. B. M. Jamison et al., the testator was obtained as a surety, the bond being for $25,000. It was payable, among

others, to Mrs. Aycock and Mrs. Rudersdorf, who are contestants. The remaining contestants were plaintiffs in the cause. On December 12, 1930, the contestants, and others, joined with testator in executing a contract with the Rycade Oil Corporation. On July 20, 1934, three years after the execution of the will and a few weeks before testator's death, contestants, and others, joined with testator in entering into a contract with the Rycade Oil Corporation and the Amerada Petroleum Corporation, making various alterations in outstanding mineral lease contracts. Contestants' witness Hardeman, whose evidence is reviewed above, took testator's acknowledgment.

In connection with the drafting of the will, the attorney for the First National Bank of Houston, named as executor, and its trust officer, went to Freeport in the first part of February, 1931, for the purpose of meeting testator and getting the necessary instructions. They were introduced to testator in the Freeport bank, and went with him over to the Tarpon Inn porch, where they had a two-hour conference. The attorney testified that he told in an intelligent manner what disposition he wanted made of his property, and that he thought him of sound mind. An original and copy of the will were sent to testator from Houston after they were there prepared, which testator later executed. On August 5, 1931, testator indicated certain changes he wanted made in the following copied letter:

"Freeport Texas 8/5–1931

"First National Bank of Houston, Texas

"Kind Friends

"In closed please find copy of my will. You fixed some time ago, I wish some c(h)anges mad(e). You will see by the pencil mark what they will be; the ones not marked will remain same. Pleas(e) make two new ones, Original & Copy I will have them signed and return Original

"2. Will have two responsible men to sign in my presence. You know all they do is witness my signature and it will be signed in their presents strictly. Afterwards you can send both so I can destroy them I ha(v) reference to the old one.

"Yours sincerely

"Ernest Seaburn."

The subscribing witnesses were R. K. Cannan and O. K. Phillips. Mr. Cannan, at the time connected with the Freeport bank, testified: That he had known testator indirectly all his life and intimately for seven years prior to his death; that he would see him once or twice or three times a week in the bank in 1931, and converse with him about business matters and matters of general interest; that he was a man of sound, alert mind and strong will power, and attended to all his business matters at the bank; that he had a very good memory and a vigorous mind; that on the 11th day of August, 1931, he came in the bank with the will offered for probate and asked for Mr. Collins and Mr. Phillips, and that, upon learning that Mr. Collins was out, he told witness he wanted witnesses to a will and that he (Cannan) would do just as well as Mr. Collins; that he, Mr. Phillips, and testator then went in to the front reception room of the bank, where testator executed the will in the presence of witness and Mr. Phillips; that testator declared the instrument to be his will; that upon having executed the will, testator took it with him; and that he was of sound mind upon the occasion of its execution.

Mr. O. K. Phillips, the other witness to the will, cashier of the Freeport National Bank, testified: That he had known testator fifteen years; that during the last ten years of testator's life he had occasion to see him almost every day down to six or eight months before testator died, during which period of time testator transacted his banking business at the bank; that witness had various conversations with testator and he was a man of sound mind and fixed determination; that testator personally transacted his business at the bank, knew the status of his accounts and other business, and his mind was vigorous; that his conversations on business matters were clear and intelligent; that on August 11, 1931, testator came in the bank and told him and Mr. Cannan that he wanted them to witness his will, which he had with him; that the will, now offered for probate, was then executed and witnessed and testator took same with him; that after the execution of the will, testator asked witness if he (testator) owed him anything for the service, and, upon being told that he did not, had the drugstore send him and Mr. Cannan a carton of cigarettes; that he never did notice anything about testator's mind to indicate that he was of unsound mind; that he was rather "tight" in business matters; that at the time of the execution of the will testator was sober and in good health.

As already indicated, plaintiffs in error have abandoned the claim urged below that

the will executed August 11, 1931, was the result of undue influence, and limit their attack on it to want of testamentary capacity. They claim that it is an unnatural will, relying on Craycroft v. Crawford, Tex.Com.App., 285 S.W. 275, 278, and Morris v. Morris, Tex.Com.App., 279 S.W. 806, 807. In the Morris Case the court said: "The theory which underlies the statutes of descent and distribution is that the course of descent prescribed by statute is the natural one. In theory, such course is the one which a person, prompted by the instincts and natural impulses which in those matters ordinarily direct the actions of mankind, would have his property go. Any departure from that course, though it may not be uncommon or unusual, is unnatural, and is presumed to have been made by the testator because of reasons rationally conceived by him which were satisfactory to him. However, whatever the causes of his action in the premises may be, they are insufficient to divert his property from its natural channel, if it be shown that the testator was unable to rationally conceive them and give them rational consideration. He must be mentally capable of comprehending, among other things, the natural claims of those he disinherits, and the relation of such claims to himself and to those of the beneficiaries named in the will, before it can be said that he is capable of knowing what he is doing and the effect of his acts."

This language is doubtless broad enough to literally cover subdivision 4 of article 2570, the concluding sentence of which reads: "If there be no surviving grandfather or grandmother, then the whole of such estate shall go to their descendants, and so on without end, passing in like manner to the nearest lineal ancestors and their descendants." Doubtless everyone knows of one or more instances where the law of descent and distribution has cast the estate of an intestate to heirs at law whom he never knew existed, and who never knew he existed. But it was not of such cases which can and do occur that the court was thinking, when it used this language, but of the facts then before it. And these facts were that a testator who had married a second husband, had disinherited her children by a former marriage.

In the Crawford Case it was said: "The philosophy of law allows untramelled range for natural affection. It includes the postulate of their reflection in dispositions of property made in contemplation of death. 'One of the main objects of the acquisition of property by the parent is to give it to his child; and that child in turn will give it to his, and in this way the debt of gratitude we owe to our parent is paid to our children. Each generation pays what it owes to the preceding one [by payment], to the succeeding one. This seems to be the natural law for the transmission of property.' Saufley v. Jackson, 16 Tex. 579, 581." Subsequently in the Crawford Case it is said: "Equality as between children in devolution of property by operation of law, in deference to presumed impartiality of love, is there [i. e. in the statutes of descent and distribution] preserved as is measurably done in the constitutional inhibition of primogeniture."

And the court was dealing, of course, in the Crawford Case with the situation where a father who was shown to have been devoted to a daughter by a former marriage disinherited her in favor of a second wife. We have a very different situation here. The law of descent and distribution itself does not contemplate that the nieces and nephews shall inherit from an intestate uncle unless they are the surviving children of a deceased brother or sister of the uncle, and the uncle has left neither wife nor children surviving him. Nor is it contemplated that nieces and nephews of an uncle shall share equally in his estate unless they happen to be also the children of the same parent, who when living was the brother or sister of the uncle. We do not mean to imply, of course, that the law of descent and distribution will not cast the estate of uncle to his nieces and nephews if he lacks testamentary capacity to make a will, and has neither wife, children, or parents surviving. We clearly recognize that the contrary is quite true. But plaintiffs in error seem to assert that the fact that an uncle has left more property to a nephew and a niece and a grandniece than he left two other nieces is in itself unnatural, and is therefore in itself evidence of want of testamentary capacity. And so of the fact that he left nothing to two of his nieces, but left $15,500 to members of a family that had befriended him for a quarter of a century. It is in the order of nature for children to survive their parent, and upon his death to succeed to his property, and in equal shares. And departure from this natural order requires explanation. To use the language of the Crawford Case: "The force which natural affection (in respect to near relatives) exerts upon the giver is not undue influence; on the contrary it is due influence. [citing author-

ities.]` That truth, by a negative pregnant, supports a reasonable mind in its concept that a devise or bequest which reflects absence of the due influence which ordinarily is incident to the relation of parent and child, in turn, reflects abnormality in the parent unless corresponding abnormality (therefore explanation) in the relationship itself be also developed. If all explanation be lacking, the trier of fact may take the circumstance as a badge of disordered or lapsed mentality or of its subjugation; if some explanation be advanced, the jury may pass upon its adequacy and attribute to the circumstance and its explanation such weight as may be thought proper, having in view all other relevant evidence." Citing Cockrill v. Cox, 65 Tex. 669, 678.

But it is not in the order of nature for a man to have as his only heirs at law nieces and nephews. And when this does happen, there is no such duty resting on him to provide for them equally, that his failure to do so may be taken as a badge of disordered or lapsed mentality. We say this with much confidence, because the diligence of counsel has not furnished us with any authority for such a proposition. And such a proposition is in itself unreasonable. The favor of a rich bachelor uncle is a thing to be cultivated, not a matter of natural right.

We do not lose sight of the fact that the case is here before us on an instructed verdict, upon the assumption by the trial court, as a matter of law, that all of the evidence introduced, if true, did not present an issue for the jury as to whether deceased had testamentary capacity. And we believe the court correctly held, as a matter of law, that no such issue was presented to the jury from all the evidence presented. It is the rule ordinarily that less mental capacity is required to enable a testator to make a will than for the same person to make a contract. Prather v. McClelland, 76 Tex. 574, 13 S.W. 543; Vance v. Upson, 66 Tex. 476, 478, 1 S.W. 179; Payne v. Chance, Tex.Civ.App., 4 S.W.2d 328. And the testimony even of the three witnesses who expressed the opinion that testator was of unsound mind, was that he was perfectly capable of handling his own business, and they either made contracts with him, or sought to make contracts with him, or assisted in connection with contracts that he did make. When we examine the evidence upon which these witnesses ventured the opinion that testator was of unsound mind,

we conclude that it is not sufficient to support such conclusion, due no doubt to a misapprehension of what is comprehended within that term. They certainly did not mean that he lacked sufficient soundness of mind to contract, for they clearly indicated the contrary. As stated in Tex.Jur., vol. 45, p. 431:

"There is necessarily a difference between the evidentiary basis for an opinion as to sanity and one as to insanity. Sanity is a normal condition of mind, which from its very nature does not specially attract attention and is difficult to cast into descriptive language, whereas, insanity is an abnormal condition of mind—the facts evidencing it stand out in bold relief, and may usually be stated with ease. Thus, it has been held that a subscribing witness to a will, without stating the facts on which he bases it, may state his opinion as to the mental capacity of the testator.

"It has been said that no rule can be made to serve as a guide to a trial court on a question of just what facts are sufficient to warrant a nonexpert to give an opinion on a question of mental soundness further than the general rule that *the facts testified to must reasonably tend to show mental unsoundness, and must be such as will enable a witness to arrive at an intelligent opinion with respect to the subject.*"

We turn now to the hypothetical question which was excluded by the trial court.

The question is too long to set forth in the opinion, but is hereto attached as an exhibit. (See appendix.) It is summarized by defendants in error thus:

"(1) That testator entertained an animosity toward people in Freeport with no explanation therefor (though the record abundantly disclosed the reasons for his dislike primarily of the two advocates of the port project, the result of which latter was to deposit silt, etc., in front of his beach home);

"(2) That he used profane language in discussing the President of the United States;

"(3) That he complained of a headache occasionally and sometimes refused to eat;

"(4) That many times when someone came to his house at night, he would arm himself (1932–1933, the record disclosing that he lived in a house down on the beach and that people coming down occasionally scared him);

"(5) That he told a friend five days before his death that he wanted a steel vault and metallic casket when he died, and that such expense was provided for in his will, but testator had not specifically mentioned the vault and casket in his will (though he definitely provided for the payment of funeral expenses);

"(6) That he read his newspaper intelligently and "raved" about items appearing therein; and

"(7) That his discussions at the bank were intelligent, but he still disliked the two advocates of the port project, Tobey and Mims.

"Such are the facts upon which, coupled with an examination of the extremely lucid and legible letter written by testator in his own handwriting to the First National Bank of Houston on August 5, 1931, directing his will rewritten, it is now urged that the witness Stafford should have been permitted to express his opinion that testator was of unsound mind on August 11, 1931. From a painstaking examination of the letter, we have endeavored to ascertain what form of mania was thereby indicated to the physician witness either by the handwriting or its content, but the conclusion is inevitable that it does but loudly acclaim the intelligent handling of a normal act, i. e., the testamentary distribution of his property.

"The remaining facts assumed by the question, if supported by the record, are equally as devoid of any indication of mental unsoundness as those relied upon in contestants' brief. Assuming that he went into his bank on August 11, 1931, and properly executed his will before two employees long known to him, which he did, and if he received hospital treatment a year or two before, a swelling being present in his legs, and if he had painful spells with his stomach commencing with 1932, and if he secured his mail regularly from the postoffice, and if he was a discriminating purchaser of groceries, and if he took the Scottish Rite degree in Masonry in 1932, and if through August, 1931, he constantly drove his own car, attending personally and regularly to its repair and upkeep, and if he maintained a regular checking account in the bank, and if he negotiated mineral leases before and after August, 1931, and if he slept badly at times, and if he sought to protect his beach home against marauders, and if he kept money in the ceiling thirty-one years before the will was executed when there was no bank at Velasco, and if he was profane and of a fixed determination, and if he had a personal encounter six or seven years before the will was executed which he liked to narrate in later years (even though fantastically) until he and his opponent shook hands and had a drink together, and if he cut wood in his youth and brought it into the kitchen over his mother's protest, and if he had to be bathed a year after the will was executed, and if he experienced nausea during illness, and if he twice cried in 1932, and if he drank at times, and if in 1933 he twice made errors in writing personal checks on his account to which he readily confessed, and if he was occasionally tired upon returning from Freeport—then we still cannot, even with strenuous imaginative endeavor, find justification for a conclusion of mental unsoundness at any time in his life, much less on August 11, 1931, when he quietly, soberly, and intelligently, according to the uncontradicted evidence in this record, walked into the bank and executed his testament before Mr. Phillips and Mr. Cannan, and immediately thereafter, in thoughtful recognition of their courtesy, sent them a carton of cigarettes."

It is enough to say, we believe, that if the statements in the question should be conceded to indicate some delusional trend in testator's mind, such has no bearing on his testamentary capacity. Vance v. Upson, 66 Tex. 476, 1 S.W. 179; Bagwell v. Shanks, Tex.Civ.App., 260 S.W. 222; Navarro v. Garcia, Tex.Civ.App., 172 S.W. 723. We do not, however, conclude that they show more than eccentricities to be expected in a person of advanced years. Nor is the subject-matter of the question so related in point of time to the date of the execution of the will on August 11, 1931, as to have any probative force on the question of testamentary capacity.

Judgment affirmed.

PLEASANTS, C. J., absent.

On Motion for Rehearing.

CODY, Justice.

We have carefully considered plaintiffs in error's motion for rehearing. It is true that in our original opinion, after calling attention to the fact that the trial court excluded the hypothetical question and giving the reasons why this action was correct,

we did not expressly state that the assignment of error based thereon was overruled.

We now expressly overrule such assignment, and, adhering to our other former conclusions, overrule the motion for rehearing.

Overruled.

PLEASANTS, C. J., absent.

### Appendix.

The question was as follows ·

"Now, Doctor, I want to ask you a question which is rather lengthy, and I will ask that you pay close attention to it, please sir, and after I have concluded reading it, reserve your answer until these gentlemen have had an opportunity to object, if they want to. Please assume the following facts: On the 11th of July, 1931, a bachelor man, then 77 or 78 years of age (whom I shall call A) went into the bank where he had been doing some of his banking business for several years, and requested two of its employees to witness a will or his will, having with him a document in writing, which he signed in the presence of such employees of the bank. He had known each of such employees for several years, and after such instrument in writing had been signed by A and the two employees of the bank, A requested them to advise him how much he owed them, and receiving a reply that he owed them nothing, left the bank with the signed instrument and returned within a short time and gave the two employees a carton of cigarettes. In the Summer of 1929 or 1930 he went to the hospital in Freeport for treatment, and in the Autumn of the same year he went to the hospital in Houston. In the year 1929 or 1930 he went to Marlin for treatment, and at that time, his feet and legs had become very much swollen. From the year 1932, he had spells with his stomach, during which he would lie down on the floor and roll, and on at least one occasion rolled under his bed and stayed there until the person in attendance and a neighbor retrieved him. Usually, the doctor called and gave him morphine or some other medicine to quiet him. After one of these attacks he usually was confined to his bed three or four days. During these spells he would cry out and exclaim that he wanted to die, and that he wished he was dead. He used to come to Freeport almost every day and would get his mail at the Post Office, call by the grocery store for his groceries and usually made his own purchases. He knew the price of the groceries and argued with the grocer that the prices were excessive. He complained to his attendant that the merchants in Freeport were trying to rob him, yet he continued to trade in Freeport. He was a member of the Masonic Lodge for a good many years, and in the year 1932 he took the Scottish Rite degree. Up until the latter part of 1931 he drove his own car and bought gasoline and lubricating oil, took it to the garage for repairs, and paid his accounts there regularly, sometimes waiting two months, but not any longer. He kept an account in the bank at Freeport; wrote checks against it, keeping up with his account. He owned Government bonds and other securities, and executed oil leases covering his interest in his parents' estate. During all the time, he did not sleep well at times. He expressed fears that someone was going to rob him or steal from him. He had his attendant to lock up his old home during the time that he lived at the neighbor's home, and complained that it had not been locked and that he could see that it had not been locked, although it was impossible for him to see the house or to discern whether it was locked from his position. Up to 1900 he kept a considerable amount of money in the ceiling of his house where he lived. There was no bank in Quintana at the time, nor at Freeport, but there was one at Velasco, about four miles distant. He was a profane man and used such language in talking about people in Freeport. He expressed on numerous occasions animosity toward the people of Freeport, but there was no explanation of it. He was of a very fixed determination and could not be persuaded to desist, nor to retract from his position. He bore a peculiar ill will toward two citizens of the town who were connected with the port project, and continued to express his opposition and personal dislike of the men after the port project had been completed in 1928, and frequently during the following years of his life he related a difficulty with one of his acquaintances (whom I shall call 'B'), which occurred in the latter's store in 1924 or 1925, in which he stated that B struck him, and that the other people present locked him up in a meat vault— A. (interrupting): Was that so or not?

"Q. (continuing): Locked him, B, up in a meat vault; that thereupon he, A, the person I am talking about all the time, left and tried to purchase a gun at a hardware store, but the merchant wouldn't sell it to him; that he then went home, and returned the following day with a shotgun, and waited on the corner for the person who had struck him, but such person did not pursue his customary route to his place of business, and that he, A, then went to the store of a Mr. Von Dohlen, whom he called Van Dohlen, and upon Mr. Von Dohlen's suggestion, he agreed to let the person apologize, provided such person, B, would come out of his store with a white handkerchief tied over his hands. That Mr. Von Dohlen and A then went to the store of the person with whom A had had such difficulty, that is, B, and that such person, B, came out of the store with a white handkerchief tied over his hands; whereupon A drew his shotgun, cocked both barrels, and called upon such person to get down on his knees and apologize and upon his complying, the matter was dropped and that A continued to trade with such person, but such transaction actually happened as follows: A came to the store of Mr. Von Dohlen and reported that such person mentioned, B, had knocked him down, and that he, A, was going to kill him, or to have him killed; that he knew a man whom he could hire to kill him; that Mr. Von Dohlen called B by telephone and after a conversation A and B shook hands and took a drink together. When A would come to town, he was usually hurrahed by some of the people of the town in the barber shop or on the street; and they would get him started and he would argue and get mad with them. He was an eccentric man, and entertained ideas and opinions of people from which he could not be dissuaded. When he was a young man, during the lifetime of his mother, he would cut wood and drag it in the kitchen and his mother, who scrubbed her own floor, would take the wood out on the porch and would scrub the floor again, and when he came back and the wood was still outside, he would become angry, and she would tell him that she would take it and put it back in the kitchen. From the month of January, 1932, his attendant would bathe him and clean him. After his spell his body was yellow when he was bathed. He used to vomit during his spells. He complained of headaches occasionally and sometimes he would refuse to eat and refuse to take his medicine. At night, when some one would knock at the door, he would run and get his gun and tell the attendant that he would stand with his gun while the attendant opened the door. No one ever tried to do him any harm or injury, but the visitors were usually neighbors, or a friend of the attendant. He was observed by his attendant to cry on at least two occasions during the year 1932. He was a heavy drinker at times. He could read and write, he wrote a good hand, and in August 1931, he wrote a letter to the First National Bank of Houston, which I am going to hand you for your examination and information in a moment, giving them instructions concerning changes in the instrument prepared by the bank's attorney for him, which was a will. He told one of his friends that he wanted a steel vault, and a metalic casket when he died and that his will would take care of it, but there was no reference to the metalic casket or steel vault in the instrument which he signed in the bank as his will. Within the last three years of his life, he had some dirt and shell put on a road running past the place where he was living in the townsite of Quintana, and objected to other persons using such road. He expressed fears that some one was going to steal water from the cistern at his parental home, which was about a hundred and fifty or a hundred and seventy-five yards from the place where he was staying, and had his attendant to take the faucet out and plug it. He complained that the cistern was only half full of water, but as a matter of fact it was full. He died in 1934, in the month of September. During the last three years of his life he was in feeble health, though not always confined to his bed. On Sundays he used to go to Freeport to get his paper. He would read his newspaper and make violent comments on the condition of affairs. In his discussion of his business at the bank, his discussions were intelligent, except his conclusions as to the people of Freeport and the two citizens thereof who had been at the head of the harbor project, and from these opinions he could not be moved. His discussions of these gentlemen and his expressions of opinion concerning them continued up until his death. He used profane language on frequent occasions in discussing the President of the United States, and he also frequently spoke disparagingly of the Masons. In writing a check for fifty dollars in 1933 to one of his attendants he wrote it for five hundred dollars, and upon examining it, stated it was correct, but upon

having the error pointed out to him, realized the error. He made arrangements with his attendants for their compensation and discussed those matters with intelligence. In 1933 he wrote a check for $70.40, when it should have been $7.40, and wrote a check for $60.75, when it should have been $6.75. When these errors were pointed out to him, he realized them. When he would go to Freeport, the people would get around him and get him to talking, get to hurrahing with him and get him worked up. On his return home from his visits to Freeport, he would sometimes be tired and complain of pains in his head and stomach. Now, Doctor Stafford, based upon the facts that I have detailed, and from your examination of the letter which I described and which I handed to you, what, in your opinion, was the mental condition of the man described as 'A,' on the 11th day of August, 1931; was he, in your opinion, of sound mind or unsound mind?"