### RODGERS et al. v. FLEMING et al.
(No. 3353.)

Court of Civil Appeals of Texas. Texarkana.
May 3, 1927.

Rehearing Denied May 12, 1927.

1. **Trial �köß260(5)—Instruction on testamentary capacity held to sufficiently submit issue, making refusal of requested instruction proper.**

Instruction in will contest on testamentary capacity *held* to sufficiently submit to jury all circumstances for consideration in determining such testamentary capacity, justifying refusal of requested instruction, which was not more explanatory of court's definition and was no more than different terms used to designate same condition of mind.

2. **Wills �köß38(2)—Testator under influence of insane delusion or delusions affecting disposition of property does not have "testamentary capacity."**

If testator at time of execution of will is under influence of insane delusion or delusions affecting disposition of his property which he was making, he does not at such time have testamentary capacity.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Testamentary Capacity.]

3. **Wills ⊃köß38(1)—"Insane delusion" affecting testamentary capacity is belief of state of facts which no rational person would believe.**

"Insane delusion" affecting testamentary capacity is the belief of the existence of state of supposed facts which no rational person would have believed.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Insane Delusion.]

4. **Wills ⊃köß324(2)—Effect of insane delusion on testamentary capacity is question of law, but its presence is question of fact.**

What constitutes in a legal sense an insane delusion and its effect on testamentary capacity are questions of law, but whether or not insane delusion is present and really dominates mind, affecting the instrument, is a question of fact for jury.

5. **Wills ⊃köß38(1)—As regards testamentary capacity, person may have delusions not showing unsoundness of mind.**

As a matter of law affecting testamentary capacity, a person may have delusions which do not imply or show unsoundness of mind.

6. **Trial ⊃köß252(18)—Refusal of instruction as to effect of insane delusion on testamentary capacity held proper.**

Evidence *held* insufficient to show mental disturbance of testator concerning poverty entirely apart from and independent of general unsoundness of mind sufficient to show insane delusion or delusion affecting testamentary capacity, and hence refusal of instruction as to effect of insane delusions on testamentary capacity was proper.

7. **Wills ⊃köß333—Jury's finding of testamentary capacity includes finding of absence of irrational belief or delusive idea on part of testator.**

Finding of fact by jury that testator had testamentary capacity *held* to necessarily include finding of absence of irrational belief or delusive idea on the part of testator, inconsistent with a deliberate mind, respecting his property or its value.

8. **Wills ⊃köß38(1)—Mere unfounded delusion is not sufficient to found judgment against will.**

A mere unfounded delusion, which manifestly does not unseat the mind in daily affairs of life, is not sufficient to found a judgment against will, as testator's right to dispose of his property as he may determine does not depend on justice of his prejudices.

9. **Wills ⊃köß38(1)—Insane delusion is not established because testator labors under misconception of facts or unfounded impressions of existence of certain facts.**

An insane delusion is not established in case the testator labors only under a misconception of facts, or as to impressions of existence of certain facts entertained by him though unfounded in fact.

10. **Wills ⊃köß38(3)—Testator's purchasing pistol to protect himself from nephew held insufficient of itself to show insane delusion.**

The fact that testator some four years before making will bought a pistol to protect himself from his nephew because he thought nephew might murder him *held* insufficient of itself to imply or show an insane delusion.

---

⊃kößFor other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

11. Wills ⬥⟹38(1)—Mistaken belief or prejudice having some basis is not "insane delusion" affecting testamentary capacity.

Any belief or prejudice, however mistaken, which has some basis for it, cannot legally be regarded as an insane delusion affecting testamentary capacity.

12. Wills ⬥⟹38(3)—Testator's error in believing nephew had caused family great deal of trouble and was disgrace to family held not "insane delusion" affecting testamentary capacity.

Error of judgment on part of testator in believing that nephew had caused his family a great deal of trouble or was disgrace to the family held not to constitute an insane delusion sufficient to defeat testamentary capacity however imperfect may have been his reasoning and even though based on misapprehension of fact.

13. Wills ⬥⟹38(3) — Testator's belief that nephew would not appreciate bequest held not insane delusion affecting testamentary capacity.

Mere belief on part of testator that nephew would not appreciate a bequest from testator held not to constitute an insane delusion sufficient to defeat testamentary capacity.

14. Wills ⬥⟹55(3)—Evidence as to testator's belief that astronomers would some day see through gates of heaven held not to show insane delusion.

Evidence relative to testator's belief that some day astronomers would be able to see the gates of heaven and to see who was inside heaven held insufficient to establish an insane delusion affecting testamentary capacity.

15. Wills ⬥⟹55(1)—Nature and terms of will, together with natural inclinations and previously declared intentions, constitute evidence of testamentary capacity.

Nature and terms of will in consistency or inconsistency with natural inclinations and previously declared intentions of testator must be judicially regarded as an essential and important part of evidence of testamentary capacity.

16. Evidence ⬥⟹14 — It is common knowledge that numerous people believe that heaven is place in reality.

It is common knowledge that it is the widely accepted belief of scriptural teaching of numerous people, commonly regarded of rational mind, that heaven is a place in reality.

17. Wills ⬥⟹38(1)—Delusion affecting testamentary capacity cannot be predicated on pure esoteric and abstract subject.

A delusion affecting testamentary capacity cannot be predicated on any pure esoteric and abstract subject, for the reason belief concerning such subjects is speculative and could not be proved false.

18. Wills ⬥⟹55(3)—Evidence held not to establish insane delusion affecting testamentary capacity.

Evidence in will contest held insufficient in respect to objects of delusion on which to found a finding of fact of insane delusion or delusions affecting testamentary capacity of testator.

Appeal from District Court, Lamar County; Newman Phillips, Judge.

Application by Morris Fleming and another for the probate of the will of W. J. McDonald, deceased. From a decree probating the will, Florence Rodgers and others, contestants, appeal. Affirmed.

This is an action to contest the will of W. J. McDonald, who died at Paris, Tex., where he resided, on February 8, 1926. The will was of date May 8, 1925. The appellees, proponents of the will, are the two executors of the will. The seven appellants, the contestants of the will, are three certain nieces and a nephew, in full and half blood, and three cousins of the testator. The contestants filed separate pleadings. The two nieces and the nephew in full-blood pleaded:

"That on the 8th day of May, 1925, the date of the execution of the purported will, the deceased, W. J. McDonald, was not of sound mind and disposing memory. That on the 8th day of May, 1925, the date of the making of said purported will, prior thereto and up to and including February 8, 1926, the date of his death, W. J. McDonald did not have testamentary capacity to make a will, was of unsound mind, and did not have mental capacity to know, understand and appreciate the character, amount, and extent of his property, or the objects of his bounty, or the real disposition he was making or attempting to make of his property by the instrument offered for probate."

The two nieces and their children are bequeathed legacies, and the nephew is omitted in the will. The other four contestants, the daughter of child of testator's half-brother, and three children of child of testator's aunt, all omitted in the will and jointly appearing by intervention, pleaded:

"Petitioners ask permission to intervene and show that they are heirs at law of W. J. McDonald and interested in the subject-matter; that the said W. J. McDonald at the time of the execution of the will offered for probate was not of sound mind and disposing memory and was laboring under an insane delusion in this, to wit, the said W. J. McDonald had fears of certain of his nieces and nephews, to wit, Dr. W. H. McDonald, that he was going to take his life in order to get his property, and that he had an insane belief as to the extent and nature of his property, and for these reasons the will offered for probate as the last will and testament of the said W. J. McDonald should not be allowed to stand. Contestants further adopt the pleadings of the other contestants heretofore filed herein."

The will was admitted to probate in the probate court, and the contestants appealed to the district court. Upon the trial in the district court a decree was entered probating the will, and the contestants appeal to this

court for review of the two errors assigned. The following is the document offered for probate:

"The State of Texas, County of Lamar:

"Know all men by these presents: I, W. J. McDonald of the above named state and county do hereby make, publish and declare this as my last will and testament, hereby revoking any other will or wills by me heretofore made.

"1. I give, devise and bequeath to Mrs. Florence McD. Rodgers, wife of A. N. Rodgers of Dallas, Texas, and to Mrs. Lillian McD. Brinton, wife of George D. Brinton of West Chester, Pennsylvania, my nieces, the sum of fifteen thousand ($15,000.00) dollars each, and to William Stromeyer and his sister, Irene Stromeyer, minors, children of the said Mrs. Lillian McD. Brinton by her former husband, the sum of fifteen thousand ($15,000.00) dollars each.

"I direct that my executors shall pay and satisfy the bequests contained in this item of my will free and discharged of any and all state or federal inheritance tax, revenue taxes or taxes of any kind whatsoever.

"2. I hereby appoint Mrs. Lillian McD. Brinton, trustee, without being required to give any bond, for the said William and Irene Stromeyer, to take possession of and handle, manage and control the bequests herein given them until they shall respectively arrive at the age of twenty-one years, or Irene shall marry, upon the happening of which event said trustee shall pay over to them their respective legacies, that is to say, such payment shall be made to the said William Stromeyer when he arrives at the age of twenty-one years and to the said Irene when she shall either arrive at the age of twenty-one years, or upon her marrying before attaining the age of twenty-one years. In case of the death of either William or Irene during minority the bequest herein to the one dying shall go to the survivor, provided that in the case of William if he should so die being married at the time, then his bequest shall descend and vest in his heirs in accordance with the laws of the state of Texas; and in the case of Irene if she should so die being married at the time, then her bequest being disposable by her own will shall be subject to such disposition or in case of intestacy to the laws of descent of the place governing it.

"3. I give, devise and bequeath to my nephew, Charles McDonald, for and during his life only, fifteen thousand ($15,000.00) dollars in United States Treasury four per cent. bonds, subject to the trust herein contained.

"I direct that my executors shall pay and satisfy the bequest contained in this item of my will free and discharged of any and all state or federal inheritance tax, revenue taxes or taxes of any kind whatsoever.

"I hereby appoint the First National Bank of Clarksville, Clarksville, Texas, trustee for the said Charles McDonald, without being required to give any bond, to receive the bequest herein given to him, and said trustee shall register the said bonds in its name as such trustee, and I hereby direct that the said trustee pay to the said Charles McDonald the net revenue arising from the interest on said bonds, as and when received, during the life of the said Charles McDonald, and at his death this bequest shall go, share and share alike, to his

children, James, William and Rosemary McDonald, provided that should the said Charles McDonald die during the minority of said children or any one of them, this trust shall continue in force as to said bonds for the use and benefit of such minor children or child during their or its minority, and upon the arrival at the age of twenty-one years, respectively, each shall receive his or her share, or should the said Rosemary marry before arriving at the age of twenty-one years, then upon the happening of that event she shall receive her share.

"During the minority of said children or any one of them, after the death of the said Charles McDonald, should he die during such minority, the trustee shall use the net interest from the share of such minor children or child, as the case may be, for the same purpose and in the same manner as is hereinafter provided for in item four of this will for the use of the interest on the bonds there devised to such children.

"4. I give, devise and bequeath to the said James, William and Rosemary McDonald, children of Charles McDonald, each fifteen thousand ($15,000.00) dollars, in United States Treasury four per cent. bonds, subject to the trust herein contained.

"I direct that my executors shall pay and satisfy the bequests contained in this item of my will free and discharged of any and all state or federal inheritance tax, revenue taxes or taxes of any kind whatsoever.

"I hereby appoint the First National Bank of Clarksville, Clarksville, Texas, trustee for the said James, William and Rosemary McDonald, without being required to give any bond, to receive the bequests herein given to them, and said trustee shall register said bonds in its own name as such trustee, and I hereby direct that the said trustee shall use the net interest from said bonds, or so much thereof as may be necessary, in the support, education and maintenance of said children, and upon the arrival of each of them, respectively at the age of twenty-one years, each shall receive the amount coming to him or her under this bequest, or should the said Rosemary marry during her minority, then upon the happening of that event she shall receive the amount coming to her under this bequest.

"If any of said children shall die without issue, and before arriving at the age of twenty-one years, the legacy of the one so dying, both that devised in this item of my will and that which may have accrued upon the death of the said Charles McDonald, shall go to the survivor or survivors of them, and if any shall die before arriving at the age of twenty-one years and without issue, then all the interest or share in my estate by this will devised to them shall go to my residuary legatees.

"5. All the rest, residue and remainder of my estate I give, devise and bequeath to the regents of the University of Texas, in trust, to be used and devoted by said regents for the purpose of aiding in erecting and equipping an astronomical observatory to be kept and used in connection with and as a part of the University for the study and promotion of the study of astronomical science. This bequest is to be known as the W. J. McDonald observatory fund. As soon as my executors shall have paid off all charges against my estate, settled with all legatees and have the estate in shape to turn over

the residue to the regents, they shall do so, using only such time to accomplish this as in their judgment is necessary, reasonable and proper. Upon receipt of such residue the regents shall proceed at such time and manner as in their judgment may seem best to execute the trust and they shall have full power and authority to administer and handle the same,for the purpose of carrying out its purpose and objects, and in so doing they may apply all or any part of the income from the bequest and all or any part of the corpus of the bequest as they may deem proper to use towards such erecting and equipping the observatory, it being my intention that the regents shall have full power and authority to handle, use and appropriate this bequest, corpus and all accrued income in such manner as to them may seem best in order to carry out the object of the bequest, the only limitation on their authority and power being that the bequest is intended solely for the use and benefit of an astronomical observatory in one or all of the ways hereinbefore mentioned. The regents shall have power to sell any real estate at any time.

"All investments are to be made in such bonds and securities as are prescribed by law for the investment of the state common school fund.

"In handling the notes due my estate the regents are requested to use the utmost liberality and leniency in the matter of renewals and extensions consistent with safety.

"6. My executors are directed to expend the sum of fifteen hundred ($1,500.00) dollars to build in the cemetery lot of J. T. McDonald in Evergreen Cemetery a family monument to be as near as may be in general style and outline like my mother's monument in the old grave yard at Paris, Texas.

"7. I hereby appoint Morris Fleming of Paris, Texas, and the First National Bank of Clarksville, Clarksville, Texas, executors of this will, and specially direct that no bond be required of them as such, and I further direct that no action shall be had in the probate courts in relation to my estate than the probating of this will and the return of an inventory and list of claims of my estate.

"In case of the death, refusal or inability to act of either of said named executors, the survivor shall have and exercise all authority hereunder as sole executor.

"8. This will is executed by me in duplicate originals, each to be of equal validity, but made in duplicate as a precaution against one becoming lost, and upon the filing and probating of either one the other is to have no further force and effect than corroborative, and the one so filed and probated is to be the will.

"9. For the purposes of identification I have signed my name on the left margin of each sheet of this will.

"10. In testimony whereof, I, the said W. J. McDonald, have this 8th day of May, A. D. 1925, signed my name hereto and on the said margins, and we, whose names appear hereto as subscribing witnesses, have on the same day, at the request and in the presence of the testator and in the presence of each other, signed our names hereto as such subscribing witnesses.

"W. J. McDonald.

"Subscribing Witnesses:
"H. L. Baker,
"J. N. Caviness."

The estate was of considerable magnitude, as shown by the admitted inventory, as follows:

| | |
|---|---:|
| United States securities | $ 408,100 00 |
| Lamar county bonds and warrants | 322,500 00 |
| Pennsylvania Railroad Company bonds.. | 5,000 00 |
| 50 shares First National Bank, Clarksville, Texas | 15,000 00 |
| 10 shares North Texas Publishing Company, Paris, Texas | 500 00 |
| 2 shares Farmers' Seed & Gin Co., Paris, Texas | 100 00 |
| Uncollected checks and interest coupons | 415 00 |
| Notes | 356,344 85 |
| Cash in banks | 87,134 22 |
| Real estate, 936 acres, estimated value.. | 50,000 00 |
| Total | $1,245,094 07 |

The testator was shown to be a careful, prudent business man, economical and of simple habits. He was president of a national bank, a private money lender and investor. The estate was accumulated by his own efforts, and none of it was augmented by inheritance. It is admitted that the testator executed the will, and that there was due compliance with the formalities of the statute in the matter. The ground of contest was that only of the existence of testamentary capacity to make the will and to dispose of his property as he did therein. The following charge was given by the court to the jury:

"The court will submit this case to you for a special verdict, upon an issue of fact in the form of the question hereinafter propounded to you and which you will answer from the evidence in the case.

"Before propounding the question referred to above I give you the following definitions and instructions:

"(1) All persons over the age of 21 years and who possess testamentary capacity have the right to make whatever disposition of their property they desire.

"(2) The burden of proof is upon the First National Bank of Clarksville, Texas, and Morris Fleming to establish by the preponderance of the evidence that on the 8th day of May, 1925, W. J. McDonald had testamentary capacity.

"(3) You are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony.

"4. To make a valid will, the person making the will must have testamentary capacity at the time of the execution of the will. By testamentary capacity is meant that the person at the time of the execution of the will has sufficient mental ability to understand the business in which he is engaged, the effect of his act in making the will, and the general nature and extent of his property. He must also be able to know his next of kin and the natural objects of his bounty. He must have memory sufficient to collect in his mind the elements of the business to be transacted and to hold them long enough to perceive at least their obvious relation to each other, and to be able to form a reasonable judgment as to them.

"Now, bearing in mind the foregoing definition and instruction, you will answer the following question:

"Question: Did or did not W. J. McDonald have testamentary capacity on May 8, 1925, at the time he executed the will in controversy? Let your answer be, 'He did,' or 'He did not,' as you may find."

The jury answered:

"Answer: He did. We, the jury, have from the evidence in the case answered the above question in the manner above written, and the answer so made constitutes our verdict in this case. J. W. Horton, Foreman."

There were no exceptions made or reserved to the instructions above given.

The two assignments of error on this appeal are based on the refusal to give two requested instructions. Accordingly the statement and discussion of the case need be mainly in that view, as the record is voluminous. It is established by proof that the testator was born in 1845, and was past 81 years of age at the time of his death on February 8, 1926. The will that is being disputed was executed on May 8, 1925, 9 months before he died. The testator was the last of his immediate race. He had never married. His mother and father both died long before the death of the testator. He had two brothers, H. D. and J. T. McDonald, and a half-brother and a half-sister, all of them having died before the testator died.

The brother H. D. McDonald died from the result of an intentional pistol shot on April 22, 1925, leaving surviving a wife and two daughters, the daughters being contestants herein. The daughters are bequeathed legacies in the will in "the sum of $15,000 each." They are married, one of them having two minor children. These two minor children are bequeathed the sum of $15,000 each. The brother J. T. McDonald died about 21 years before the testator, leaving surviving him two sons, Charles and W. J. McDonald. Charles McDonald is bequeathed $15,000 "in United States Treasury four per cent. bonds." His three minor children are bequeathed "each $15,000 in United States Treasury four per cent. bonds." The other son, W. J. McDonald, a contestant, is not mentioned in the will, for reasons which were the special subject-matter of dispute in the evidence.

The half-brother, Dan McDonald, died some years before, leaving surviving him a daughter, who is married. This niece in half-blood, a contestant, is not mentioned in the will. The other three contestants are not mentioned in the will. Their grandmother was the aunt of the testator.

We conclude that there is ample evidence in support of the finding of fact made by the jury, and such finding of fact is approved and here adopted as the finding of fact by this court, that the testator, W. J. McDonald, had sound and discerning mind and memory of the state of testamentary capacity at the time he executed the will to make the will and dispose of his property as he did therein.

A. P. Park and Sturgeon & Sturgeon, all of Paris, Phillips, Townsend & Phillips, of Dallas, Rodgers & Rodgers, of Texarkana, Harrison & Woodruff, of Brownwood, and Patrick & Eubank, of Paris, for appellants.

W. F. Moore, Long & Wortham, Tom L. Beauchamp, and Hutchison & Hutchison, all of Paris, and Claude Pollard, Atty. Gen., for appellees.

LEVY, J. (after stating the facts as above). [1] Special instruction No. 1, asked by the contestants and refused by the court, the refusal of which is assigned as error, was as follows:

"You are instructed that if at the time of the execution of the will by W. J. McDonald on May 8, 1925, he did not have strength of mind equal to the purpose to which it was applied, then he did not have testamentary capacity at said time."

The instruction was seemingly intended to have the jury determine whether the testator at the time of making the will had such capacity of mind and memory as to enable him to intelligently understand and give sufficient attention to the transaction of the particular business involved in the disposition of his estate in an elaborate will, in the view of the circumstances of old age, weakness of body, and a want of a vigorous mind. It is believed that the court's instruction upon testamentary capacity did not withdraw or fail to allow, but left it to the jury to take all these circumstances into consideration in the determination of whether or not the mind and memory, or either of them, of the testator had become too enfeebled to be intelligently sound and discerning in respect to the particular business transaction being considered at the time. The jury were plainly informed that the testator was required to have "mental capacity" at the time of the execution of the will, "sufficient" to the following discernment or strength: "To understand the business in which he was engaged, the effect of his act in making the will, and the general nature and extent of his property. He must also be able to know his next of kin and the natural objects of his bounty." Further, the testator was required to "have memory" at the time of the execution of the will "sufficient" to the following state or strength: "To collect in his mind the elements of the business to be transacted, and to hold them long enough to perceive at least their obvious relation to each other, and to be able to form a reasonable judgment as to them." Such description of capacity manifestly required the testator's mental condition to be of such "strength of mind" as would be "equal" or vigorous enough to make disposition of the estate in an elaborate will, as that in evi-

dence. The special instruction was not more explanatory of the court's definition and description of testamentary capacity, and was no more than different terms used to designate the same condition of mind; and the court's instruction came up to the standard of a sound and disposing mind and memory repeatedly asserted by the courts. Prather v. McClelland, 76 Tex. 574, 13 S. W. 543; Brown v. Mitchell, 75 Tex. 10, 12 S. W. 606; Tregevant v. Rains, 85 Tex. 329, 23 S. W. 890; Id. (Tex. Sup.) 19 S. W. 567, and other cases.

Special instruction No. 2, asked by the contestants and refused by the court, the refusal of which was assigned as error, was as follows:

"If at the time of the execution of the will by W. J. McDonald on May 8, 1925, he was under the influence of an insane delusion or delusions affecting the disposition of his property which he was making, then you are instructed that he did not at said time have testamentary capacity. An insane delusion is the belief of the existence of a state of supposed facts which no rational person would have believed."

[2-5] The court's instruction did not include the "delusion" test as apart from the general unsoundness or derangement of the mind of the testator in the present case. And the doctrine and the form of the requested instruction is not open to question. Vance v. Upson, 66 Tex. 476, 1 S. W. 179; Prather v. McClelland, 76 Tex. 574, 13 S. W. 543; Lanham v. Lanham (Tev. Civ. App.) 146 S. W. 635. However, such test has been severely criticized in some cases. The point presented requires the determination of the scope and extent of the particular circumstances relied upon as subjects of delusion apparent upon examination. What constitutes, in a legal sense, "insane delusion," and its effect upon testamentary capacity, are questions of law; but whether or not insane delusion is present and really dominates the mind, affecting the instrument, is a question of fact for the jury. Prather v. McClelland, supra. It is well settled that, as matter of law, a person may have delusions which do not imply or show unsoundness of mind. Denson v. Beazley, 34 Tex. 191; 32 C. J. § 51, p. 604. The precise delusions contended by the appellants to have been shown to exist influencing the testamentary capacity of the present testator and affecting the disposition of his property were in relation to the following subjects as set out in the brief:

(1) "That the testator was suffering with an insane delusion of poverty." (2) "That the testator was suffering with an insane delusion" that a certain relation in law had wrongfully deprived him of certain of "his tablecloths, napkins, and books." (3) "That the testator was suffering with an insane delusion that he had to protect himself against his nephew, one of the contestants, who, he thought, intended or desired to murder him

in his home on Clarksville street." (4) "That the testator was suffering with an insane delusion that some day astronomers would be able to see the gates of heaven, and when we got (to) that we would be able to see who was inside of heaven; that it was only a question of time when they did that, and then this would be the next great wonder of the world, and it needed only a little money."

The statements and conduct of the testator specially bearing upon the above objects are to be weighed in the light of the overwhelming testimony of the soundness of the mind and memory of the testator to make the will and dispose of his property as he did therein.

As to the first object of delusion, "poverty," the following special circumstances are relied upon: In 1924 S. M. Harper, a cattle dealer, offered to lease from testator certain grass lands for pasture of his cattle, and the testator replied:

"I want to let that grass grow up and make hay; that's the way I've got of making my living, selling the hay."

The witness states:

"That was about the extent of the conversation I had with him. He did not seem to want to talk much that day, and before that he usually had talked a great deal. When I asked about leasing the grass land he just answered me the way I have stated. He seemed rather weak physically."

In April, 1925, the following occurred between the testator and his sister-in-law:

"After my husband's death (April 22, 1925), W. J. McDonald was at my house, and he wanted to discuss with me what I was going to do. I told him I was going to my daughter's. He asked me when I was going. I said when they went back to Dallas. He said, 'What will I do, Irene?' I said, 'William, you will have to look out for yourself, as I have to look out for myself.' He said, 'I couldn't live eating at restaurants.' I said, 'Well, I am sorry, but I cannot stay here and take care of you any longer, but I will do this after I go with my daughters for a week or so; I will come back and keep house until fall if you will pay half of the expenses.' He said he was not able to do that, and for me to go on with the girls and he would talk to me about it afterwards."

In this connection it appeared that testator had been living in the house with his brother and sister-in-law, and that his sister-in-law had regularly prepared a special diet required for testator. Miss Dethrow, a graduate nurse, testified:

"I nursed W. J. McDonald in the Sanitarium of Paris about three months beginning, as I remember, about the last of September, 1925. I was his special nurse. I do not think he had a special nurse when he entered the sanitarium. I did not nurse him up to the time of his death, because he did not want me to do so. One

night he told me he was going to try to do without me for a few days; he did not feel like he really needed a nurse and he was not able to keep one any longer. That conversation occurred about 8:30 at night. The lights were out and I had retired. I stayed in the room with him, on a cot in the same room. He called to me, and I have told the exact language he used as near as I remember. He gave me my discharge."

Clarence Mills testified:

"I live and work in the Sanitarium of Paris. My duties are to wait on men patients. I took care of Mr. McDonald in the sanitarium after he got down in bed. I bathed him, fixed up his bed and catherized him. He could not pass his urine without the aid of a catheter. The cost of a catheter is something like 4 or 5 cents. He used soft rubber catheters, and always wanted to tell me what to do and what not to do. I already knew what to do in use and care of a catheter. In using a catheter you are supposed to sterilize it, place them in boiling water before and after using them. I did not do this because Mr. McDonald did not want it done. He gave as a reason that it would break or wear out catheters sooner than otherwise. It hurt the life of a catheter to sterilize it in boiling water. He told me he always just washed them and did not boil them, and had been using them for nearly six years, and I carried out his instructions. He had a box that he kept them in."

The tax sheets offered in evidence for 1925 and 1926 showed rendition for taxes of lands and lots, and in the list of "personal property" appear items only of the aggregate value of $410.00. There was proof of a weakened condition, physical and mental, from old age and disease. And there were shown instances of forgetfulness and failing recollection, and about which the testator indicated sensitiveness when his attention was called to it. In opposition to this testimony it was proved that the testator attended to his business with sagacity and looked sharply to his interests. During the last two or three years of his life the testator began to put his money very largely in bonds, which he would buy in large quantities and large amounts, and would renew notes secured by liens on lands, and made several new loans. He was shown to have started life a very poor young man and to have lived in a very economical, simple and saving way. He accumulated a large estate by thrift and good business judgment. The testimony is in line with the following quotation from the witness Roberts:

"Mr. McDonald had his characteristics. He did not dress up, and usually wore ordinary, but good, clothes. He was not a dressy man. He did not look nor act like a rich man. He did not boast nor make a show of his wealth. He was a saving man, and did not believe in wasting money, and I never saw him waste any. I never did see any change in the life of Mr. McDonald. He was just the same all the time I knew him. I never knew him to indulge in any flights of extravagance or become anything other than the W. J. McDonald I had known all my life."

[6, 7] His secretary testified to donations to Boy Scouts, Salvation Army, Red Cross, and charity. He was for a long time the president of a large bank, and had large experience in business matters of importance. "When business matters came up," as testified, "he would take his time before acting. He was very deliberate, and I never saw him go off half-cocked at any time." He was regarded by witnesses as "an exceptionally good business man—a man of good judgment."

Up to and for several years prior to his will he was spending $1,000 a year on the education of a grandnephew. None of the witnesses of the proponents or contestants testified to any act of the testator tending to show or raising the presumption of any confused and sudden impression of the extent of his property, or a mistake of fact or lack of due appreciation of the nature and amount of his property. There were no new accessions of property immediately before the making of his will. The evidence does not suggest how such a delusive idea, if existing, could or did affect the disposition of the testator's property, or could or did specially render the testator indifferent to his property in the disposition of it. All the circumstances in evidence being considered, it is not perceived that a reasonable ground is presented of mental disturbance concerning poverty entirely apart from and independent of general unsoundness of mind. In the charge the court pertinently required the testator to have testamentary capacity to understand "the general nature and extent of his property." That includes the very substances of the presently considered matter, and was the specially alleged ground of the contest. The jury must have understood by the charge, if they believed he had not such knowledge or understanding, that the will was invalid as the product of an irrational or disordered intellect. The jury answered that the testator did have such mental capacity and recollection of the property according to all the evidence before them. Such finding of fact necessarily includes the finding of the absence of any irrational belief or delusive idea on the part of the testator, inconsistent with a deliberate mind, respecting his property or its value. And the testimony of all the witnesses who were in a position to know and who were associated with the testator in a business way showed that he had capacity to know and recollect his property, and in fact did know, in all essential details, the extent and value of his property.

[8, 9] As to the second ground of delusion the circumstances specially offered appear as follows: "In 1921 he told me that the particular relative (named in the evidence) had taken tablecloths, napkins, and books from

him." "He said to me," as another witness related, "that the relative (named in the evidence) was a keen, shrewd, designing woman and as unscrupulous as hell. He was very much embittered against her especially. This feeling existed without any cause on her part." The inquiry was not pursued in details further than stated. In opposition to these declarations it was conclusively proved that this relative and the testator lived in harmony and in friendly relations to the time of the testator's death. The testator made bequests, as appears in the will, of substantial amounts to all her children and as well to her husband, who was a full-blood nephew. Up to and for a year prior to the execution of the will in suit the testator was sending her son to the University of Texas and spending $1,000 a year on his education. They "frequently visited and conversed with each other." Such harmonious course and practice of dealing strongly warrants the presumption of fact, in the course of common experience, that the false impression and the erroneous belief of testator, either or both, appearing in the two declarations set out, did not in anywise bias or dethrone his reason to the dignity of an "insane delusion." It is not an added fact of legal force that the particular relative by affinity, a sister-in-law, was omitted from the will in view of the conduct and dealings mentioned. She would not have inherited had no will been made. And assuming that the declaration made by the testator in 1921 that the particular person had taken certain of his property was capable of disproof and was in fact an untrue declaration, yet, standing in connection with the other evidence of conduct and dealing, such false impression or belief at the time was evidently so far removed or reasoned away or rested so lightly as not to becloud the testator's reason or amount to a mania before or at the time of making the will. And assuming that the other declaration could be attributed to a "feeling" or prejudice which "existed without any cause on her part" rather than that of mere deductions of character, yet such circumstance, when considered alone or in connection with all the circumstances, warrants the conclusion only of a mere prejudice without warrant. A mere unfounded delusion which manifestly does not unseat the mind in the daily affairs of life, as so conclusively shown in all the evidence, is not sufficient to found a judgment against the will. The testator's right to dispose of his property as he may determine does not depend on the justice of his prejudices. Jackson v. Jackson, 39 N. Y. 153. An insane delusion is not established in case the testator labors only under a misconception of facts or as to the impressions of the existence of certain facts entertained by him, though unfounded in fact. Burris v. Burris, 210 Ky. 731, 276 S. W. 821.

As to the third ground of delusion the circumstances specially offered appear as follows: Mrs. McDonald testified:

"After the death of my husband (April 22, 1925) I was living in Dallas with my daughter. I saw W. J. McDonald (testator) every ten days or two weeks. I had conversations with him. They were very disjoined. Based upon my conversations with and observations of W. J. McDonald, on May 8, 1925, in my opinion, he was emotionally and temporarily crazy. Besides the reasons already given, some additional reasons are that when he bought his place on Clarksville street there was a beautiful vineyard there in a healthy condition and fruitful. Some boys depredated upon it on one occasion, and he had the entire vineyard cut down. He killed a very fine flock of Pekin ducks because he discovered they were polygamists. When in Paris, in 1921, he told me that he had bought a pistol to protect himself from Will McDonald because he thought he might murder him in his home on Clarksville street."

The witness Constance McQuistion testified:

"I have known W. J. McDonald all my life. I was related to him. I was his private secretary for several years. I am acquainted with Dr. Will McDonald, who lives in Morris county. Dr. Will McDonald visited W. J. McDonald (testator) a number of times, but his visits were possibly several months apart because he did not come to Paris very often. Mr. W. J. McDonald and Dr. Will McDonald seemed to be on friendly relations while in company with each other and in my presence. When Dr. Will was not around Mr. W. J. McDonald was just as bitter against him as could be, but when Dr. Will was there you would never know but what they were on the most intimate terms. I never heard Mr. W. J. McDonald express any special fear of Dr. Will McDonald, only he felt that Dr. Will was looking forward to his getting his money. He seemed to feel that Dr. Will was just waiting for him to die to get his money. I never observed any act or conduct on the part of Dr. Will McDonald or heard any threat made by him that would form any basis in fact for W. J. McDonald's belief that Dr. Will was planning to take his life or do him harm in order to get his property. Dr. Will was always just as respectful as could be."

Dr. Will McDonald was a nephew of the testator, and was not mentioned in the will. It was shown by the proponents that the testator drew up several wills prior to the one in suit. The first one was drawn up in 1915, and Dr. Will McDonald was given a bequest therein of $5,000. In all the other wills drawn up since that one Dr. Will McDonald was omitted therefrom. The stenographer typewriting the wills testified:

"The second will was written after Mr. Will McDonald had some family trouble. In that will he cut out bequests made in the first will to Miss Alice Wright and to Dr. Will McDonald. He said one of the reasons why he left Dr. Will McDonald out of the will was because 'he was a disgrace to the family and he would cut him out.' He said also as to

Miss Alice Wright, 'I have decided if I want to do anything for her I'll do so in my lifetime.'" •

The attorney who drafted the will of October 22, 1924, the one before the one in suit, testified:

"Dr. Will McDonald was not named in that draft. W. J. McDonald made a short statement to me with reference to Dr. Will McDonald. I can't quote his exact language, but he said that Will McDonald had caused his family a good deal of trouble and he would not appreciate anything W. J. McDonald gave him anyway."

[10, 11] Assume the fact to be true that the testator "in 1921," four years before the will in suit was made, "bought a pistol to protect himself from Will McDonald, because he thought he might murder him in his home on Clarksville street." Of itself the circumstances would not imply or show an insane delusion. Any belief or prejudice, however mistaken, which has some basis for it, cannot legally be regarded as an "insane delusion." 40 Cyc. p. 1014, citing numerous cases. And it is not affirmatively shown that at that date the testator was possessed of a wholly groundless fear of harm at the hands of his nephew in the nature of an hallucination. But considering the opinion as expressed by the other witness, the inference may arise that there was no "basis in fact for W. J. McDonald's belief that Dr. Will was planning to take his life or do harm in order to get his property." Although the testator's belief or delusive fear may be considered as unquestionably unfounded, yet, as conclusively appears, such false impression or belief at the time was not permanent and was removed or reasoned away before the time of the will. It evidently did not have the tenacity characteristic of an "insane delusion" if consideration be given, as must be, to the other evidence offered by contestants. Harmony and friendly relations are clearly shown, existing to the time of the will. According to the witness McQuistion, the nephew often visited the testator, and "you would never know but what they were on the most intimate terms. I never heard W. J. McDonald express any special fear of Dr. Will McDonald." And these kindly meetings and friendly relations with each other were subsequent to 1921 and before and up to about the time of the execution of the will. Considering all the circumstances, there is no grave doubt remaining unremoved that the testator did not at least since 1921 entertain a belief or fear that his nephew would kill him sufficient to be accounted the production of a diseased or irrational mind. The case of Vance v. Upson, supra, is not similar in facts. That was a case wherein the evidence disclosed that the testator manifestly was insane, the court saying:

"The evidence in this case cannot be read without coming to the conclusion that James Vance was essentially an insane man from some time in the year 1868, until his death in the year 1881, and it seems not to be denied by the appellant, that during a great part of that time he had not testamentary capacity."

[12, 13] The testator may have had, as indicated by the evidence, a "bitter feeling" towards his nephew. But all the circumstances show such feeling towards the nephew to have been the result of the acts and conduct of the nephew. As testified, the testator declared he "was a disgrace to the family," referring to the divorce dissolving his marriage relation. And disgust was expressed by the testator because "he had caused his family a good deal of trouble" and because "he would not appreciate anything W. J. McDonald gave him." There is no pretense in the evidence that there is not some basis in reality for a feeling or "bitter feeling" of its kind on the part of the testator. The evidence is not so unfounded as that a dislike or harsh views of the nephew on the part of the testator could be attributed to none other than delusive ideas springing from a diseased or morbid condition of the mind. In the circumstances it is not an added fact of legal force that the nephew was omitted from the will in suit. It was no change of testamentary intention, long adhered to. Testator, as shown, drafted several wills before the present one. The first will, being of date "before 1916," devised "$5,000" to this nephew. The second will was "prior to the Corpus Christi flood." In this second will the nephew was omitted, upon the ground, as stated by testator, "because he was a disgrace to the family." In the several other wills he was likewise omitted. In the will of 1924 the testator stated at the time as a reason for omitting this nephew that "he had caused his family a good deal of trouble," and because "he would not appreciate anything given him." In view of the continuing omission of the nephew from these wills after the first one, the discrimination against him in the last will in suit reflects the act of a deliberate mind. Spontaneity in lacking of some imaginary wrong or offense causing the testator to disinherit the particular nephew. Error of judgment on the part of testator that "he had caused his family a great deal of trouble" or "was a disgrace to the family" would not constitute an "insane delusion," however imperfect may have been his reasoning and even though based upon a misapprehension of facts. 1 Alexander, Com. on Wills, p. 464. And the mere belief of the testator that the nephew "would not appreciate a bequest from testator "anyway," or as much as the testator desired, cannot be said to be an "insane delusion."

As to the fourth ground of delusion, that

astronomers some day would be able to see the gates of heaven and see who was inside heaven, the following evidence, in view of the bequest in the will, is relied upon by the contestants: Autrey Burnett (colored), a witness for the contestants, testified as follows:

"I have lived in Paris since 1886. I am a barber. I run a barber shop for white people. I have 10 or 12, sometimes 14 chairs. I knew W. J. McDonald during his lifetime. I knew him about 30 years. He shaved in my shop more or less all the time. I was his regular barber. I shaved him myself personally. I remember Mr. H. D. McDonald's death. I saw Mr. W. J. McDonald in my barber shop about three or four days after the death of Mr. H. D. McDonald. He came in and had a shave very early in the morning. Henry Jones, I think, was the barber who shaved him. I had a conversation with Mr. W. J. McDonald on that occasion. After Mr. McDonald got through shaving, I brushed him off and he touched me and went to the room in the back end of the shop. It is the room we have baths in. Mr. McDonald asked me if I knew old man Paul, the old weather phophet that used to live here, and who is now dead. I told him I did. He said to me, 'Do you know he was one of the smartest men we had in his day?' I told him I thought so myself. Then he went on to talk to me about astronomy, and of course I did not know what he was talking about. He went to work and said some day or another astronomers would be able to see the gates of heaven, and when we got to that we would be able to see who was inside heaven. He said then that it was only a question of time when they did that; that would be the next great wonder of the world and it only needed a little money. That was the extent of the conversation; about that time some one approached in the back part and he left me then. That is substantially all he said on that occasion. I have talked to Mr. McDonald confidentially lots of times, about different things and the weather and crops. He was a very smart man, a very bright man. I never thought much about this matter, no more than I did on any other question."

Stress is laid on the declaration, "Some day or another astronomers would be able to see the gates of heaven, and when we got to that we would be able to see who was inside heaven; that it was only a question of time when they did that, and that would be the next great wonder of the world and it needed only a little money." The above occurrence was 12 days before the date of the will. The added circumstances are that the testator was an old man, physically weak, with serious and painful disease and lessened vigor of mind and memory, and that the will devised a large per cent. of the large estate, "all the rest, residue and remainder, to the regents of the University of Texas, to be used and devoted by said regents for the purpose of aiding in erecting and equipping an astronomical observatory to be kept and used in connection with and as a part of the University for the study and promotion of the study of astronomical science. This bequest is to be known as the W. J. McDonald observatory fund." In opposition by proponents was the testimony of numerous witnesses, who were in a position to know and who were associated with the testator in a business and social way, to the effect that before and up to the date of the will the testator manifested practical judgment and sound mind and memory; that during all of his mature life the testator "read a great deal and was well informed on different things, was well informed on many topics," and "was very much interested in" and "frequently conversed about astronomy, plant life, and botany." It was proven that the testator drafted six wills between 1915 and 1925, and in each will appeared, as in the will in suit, the devise to the regents of the University of Texas for an astronomical observatory; that the brother of the testator knew of the devise in the wills before his death. As testified by the secretary of the testator:

"When I wrote the third will Mr. Henry McDonald was present, and W. J. McDonald had a manuscript to go by in the handwriting of Mr. Henry McDonald. All of them from then on were in the handwriting of Henry McDonald."

Further, in connection with the bequest to the regents:

"At the time the fourth will was drawn up he (testator) remarked, 'It takes a whole lot of money for these scientific experiments.'"

A witness who knew testator intimately testified:

"He made statements to me about the universities in the East when he would return from visits to Mrs. Brinton (at Philadelphia). He told me that the schools up there were better prepared and equipped about these things than the schools down here. He said rich people up there when they died gave their money to the universities, and that they had better schools up there than they had down here."

The following declarations of testator concerning the University of Texas appear:

"He said it was not a place to educate boys and girls; that they got no real education there, and that he thought it was terrible for the people of Texas to be taxed to educate lawyers and doctors, and that they might as well have a school to educate plumbers as doctors and lawyers. This conversation took place about the time Jim McDonald was a student at the University. He said there were some departments of the University of Texas which ought to be abolished; that they were such a complete farce, and the law department was one of them. He believed fully in one bearing his own expenses for an education, without taxing people to obtain it."

About the time of the above declarations testator was sending Jim McDonald, his

grandnephew, to the University, and was spending about $1,000 a year on his education.

[14-16] We conclude that it is plain that the will in suit, in its provisions as to the erecting and equipping of an astronomical observatory at the University of Texas, was not the result of any sudden impulse, but of a definite and deliberate purpose and testamentary intention formed and adhered to in former years by the testator while sufficient soundness of his mind and memory admittedly existed. The same specific bequest appeared in the first will in 1915 and was inserted in each of the five other wills made respectively during the ten years to 1925. The fact that the testator supervised his own large estate wisely and prudently during the times of these wills until the date of the will in suit opposes an inference that he was of an irrational mind to a degree to incapacitate him from making the will and disposing of his property as he did. It was long known to the testator's most beloved and trusted brother that it was his purpose to make the specific bequest. And the declarations of the testator as to the reason actuating him in making the specific bequest, made at times before the last will was drawn, show a thoughtful and rational mind rather than a mind unbalanced and incapable of that soundness of judgment which the testamentary disposition of his property required. The testator declared that "the universities in the East," about which he knew, "were better prepared and equipped about these things than the schools down here," and "rich people up there when they died gave their money to the universities," and that "it takes a whole lot of money for these scientific experiments." And testator was shown to be for years "very much interested in astronomy, plant life, and botany." There is no pretense in the evidence of a sudden change or departure in the last will of testamentary intent indicated in the bequest to the regents of the University from ordinary habits of thinking and acting in that respect. Such declared intentions anterior to the will in suit, continued for a considerable period of time to the date of the will, give information of the state of mind of the testator when confessedly sound upon the particular subject, and so aid to a material degree in determining whether the bequest of the instrument is the product of the same will. It is well settled that the nature and terms of the will in consistency or inconsistency with the natural inclinations and previously declared intentions of the testator must be judicially regarded as an essential and important part of the evidence of testamentary capacity. The recent act and spoken declaration of the testator as testified to by the witness Autrey Burnett does not go to show a sudden and marked change in the habits of thinking and acting of the testator not in the course of common experience. The witness was not a pure stranger whom the testator impulsively selected to relate or discourse upon imagined conditions. It is significant that the witness, as he said, was and had been for many years the testator's "regular barber" and had "talked to Mr. McDonald confidentially lots of times about different things and the weather and crops." And the spoken declaration, standing by itself, when duly considered and subjected to tests determinative of "insane delusion," does not cast a suspicion of morbid error of judgment or of outpourings of a mind that does not think and reason intelligently or rationally, in the course of common experience. Taking the spoken declaration in literalness of the language used, and giving full force and effect to it, there are not found expressions, utterances, conceptions or ideas strange, purely of disordered imagination, and never thought of by minds commonly regarded as intelligent and rational, in the course of common experience. Compare the phrase, "the gates of heaven" with that recorded in Genesis 28:17 reading, "And this is the gate of heaven." And even "the windows of heaven were opened." Id. 7:11. As a matter of common knowledge it is the widely accepted belief of scriptural teaching of numerous people, commonly regarded of rational mind, that "heaven" is "a place" in reality; that "hereafter ye shall see heaven open and the angels of God ascending and descending upon the Son of Man." The testator's avowed belief "that when we got to that (the time of being 'able to see the gates of heaven')," then "we would be able to see who was inside heaven," in no wise disagrees with the widely accepted belief of numerous people that "heaven" is the abiding place of the "blessed dead," "the people who have gone to heaven." The comparison makes more intelligible the spoken declaration. Quoting from Denson v. Beazley, 34 Tex. 191:

"In Tennessee it was held * * * 'there is proof in the record' * * * 'tending to show that the testator held opinions somewhat peculiar in relation to futurity, to wit: That there was degree in heaven; that whatever circle of life a man lived in on this earth would be enjoyed by him in heaven; that the pre-eminence there depended materially upon the amount of property he acquired here, and the charitable purposes to which he might have appropriated it.' * * * But who shall say that the opinion avowed by the testator, as to futurity, is a delusion. * * * We can comprehend the delusion of a man who fancied he was Jesus Christ, and kindly extended his forgiveness when asked, saying 'I am the Christ;' also his who imagined he corresponded with a princess in cherry juice, and his who dreamed dreams and heard voices directing him to burn York Minister Church. But we cannot comprehend a delusion upon a point of * * * future rewards and punishments, and the prin-

(295 S.W.)

ciples of justice upon which they will be distributed. This is a subject beyond the ken of mortal man, and in one sense of the word * * * every individual is laboring under a delusion who attempts to solve it."

[17] But the language of the spoken declaration is capable of a meaning different from the spiritual sense, entirely more consistent and in line with the surrounding circumstances. It was a mere chance conversation, and not pertaining to religious views or about spiritual matters as such. An uninformed witness, as he was, in repeating a declaration on an abstruse subject, as "astronomy," may unintentionally pervert the sense of the original declaration and be apt to convert to his own the language of the speaker. It was "astronomy" that the witness said the testator "went on to talk to me about, and of course I did not know what he was talking about." An informed person, as was testator, specially "interested in" and who "frequently conversed about astronomy, botany, and plant life," would reasonably understood astronomy as the science which describes "the heavenly bodies" in a material sense. And, as predicated by the testator according to the witness, "astronomers would be able," in figurative expression, "to see the gates of heaven," in the wide generalization of "some day or another," and "see who was inside heaven." In applying these considerations to the particular declaration it is most likely and natural that the words of the testator were "see the heavenly bodies" rather than "see who was inside heaven." The very terms of the will, made two weeks afterwards, evidence the mind of the speaker at the time in "the study and promotion of the study of astronomical science." All the evidence goes to show that the real force and substance of the spoken declaration was that of a pure predication or avowed belief of the scientific progress "some day or another" of astronomy, with proper equipment and funds for observation. At most that was the force and effect of the spoken words of the mere chance conversation, even though couched in language extravagant or facetious. It is not capable of disproof that there may not be progress and perfectly established scientific theory, founded on the widest study of the celestial regions, of which at present we apparently know so little. The belief has prevailed among thinking man of telescopes being made with powers far exceeding our present ones to "see" or observe "the heavens" and "the heavenly bodies." And the probability received many striking confirmations from the scientific discoveries of modern times. The authorities are numerous, and cited in the briefs, adhering to the rule, quoting from Taylor v. McClintock, 87 Ark. 243, 112 S. W. 405:

"A delusion cannot be predicated upon any purely esoteric and abstract subject, for the reason that beliefs concerning such subjects are speculative, and could not be proved false."

[18] After a careful consideration of the record, we conclude that there is no sufficient evidence in respect to the objects of delusion, considered singly or all together, upon which to found a finding of fact of insane delusion or delusions affecting the testamentary capacity of the testator. We conclude the evidence is ample and greatly preponderates in support of the jury verdict, arrived at under proper and complete and duly approved instructions. The judgment is accordingly affirmed.